# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

October 18, 2019

Lyle W. Cayce
Clerk

————

No. 19-30353

————

In re: REBEKAH GEE, in her official capacity as Secretary of the Louisiana Department of Health; JAMES E. STEWART, SR., in his official capacity as District Attorney for Caddo Parish,

Petitioners.

————

Petition for a Writ of Mandamus
to the United States District Court for the
Middle District of Louisiana

————

Before OWEN, Chief Judge, and WILLETT and OLDHAM, Circuit Judges.

PER CURIAM:

This is an extraordinary case. An abortion clinic and two of its doctors seek a federal injunction against virtually all of Louisiana's legal framework for regulating abortion. As part of this effort, Plaintiffs challenge legal provisions that do not injure them now and could not ever injure them. The district court, however, concluded it would be "untenable" to make Plaintiffs establish their standing because doing so would make it more difficult for them to succeed on the merits. That was obvious error. Still, we exercise our discretion not to grant Defendants' mandamus petition at this time because we are confident it is unnecessary.

## I.

Plaintiffs brought a "cumulative-effects challenge" to Louisiana's laws regulating abortion. They argued the provisions taken as a whole were unconstitutional, even if the individual provisions were not. Louisiana moved

to dismiss on jurisdictional grounds and because Plaintiffs' theory is foreclosed by precedent. The district court denied the motion to dismiss but certified its order for interlocutory appeal under 28 U.S.C. § 1292(b). The court explained the cumulative-effects issue is one "of first impression that requires the interpretation of recent Supreme Court precedent without the benefit of clarification from the [Fifth Circuit]." May 15, 2018 Order, Doc. 76 at 3.

Plaintiffs then persuaded the district court to rescind the certification so they could amend their complaint to add individual-effect challenges to some of the provisions. After Plaintiffs amended their complaint, Louisiana again moved to dismiss under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. The district court again denied the motion. But this time, the district court did not certify its decision for interlocutory appeal. It's difficult to understand why because the court found that the Amended Complaint still contained a "cumulative effects cause of action" and that "[w]ith respect to the applicable law which guides this Court, nothing has appreciably changed." March 29, 2019 Order, Doc. 103 at 13, 20. Without explaining its change of heart, the district court concluded "this is not a case of first impression." *Id.* at 20.

Stranger still, the district court refused to consider Louisiana's jurisdictional arguments because doing so might make it difficult for Plaintiffs to prevail on the merits. *Id.* at 15. The court acknowledged Louisiana's argument that Plaintiffs' challenges to certain provisions "could not possibly be justiciable" and said that argument "appear[ed] persuasive" "[i]n a vacuum." *Id.* at 14; *see also id.* at 11 ("Defendants also claim that the Court lacks Article III jurisdiction to consider a challenge to many of the individual laws included in Plaintiffs' cumulative effects challenge."). The court nonetheless refused to analyze Plaintiffs' standing to challenge each provision included in their

No. 19-30353

cumulative-effects challenge: "[T]o take on each regulation, individually and separately," would place Plaintiffs "in an untenable position where they are forced to individually challenge many facially valid regulations, despite the fact that, taken together, such provisions may violate the directives of both *Planned Parenthood* and *Casey* [sic]." *Id.* at 14–15.

Louisiana petitioned this Court for a writ of mandamus.[1] With Mississippi and Texas both supporting the petition as amici, all three States in our Circuit have asked us to intervene. Louisiana asks us, among other things, to use the writ of mandamus to dismiss two counts in the Amended Complaint.

## II.

Under the All Writs Act, federal courts "may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). That includes the writ of mandamus requested here. *See, e.g.*, *Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 380 (2004). But because mandamus "is one of the most potent weapons in the judicial arsenal, three conditions must be satisfied before it may issue." *Ibid.* (quotation omitted). The Supreme Court has explained:

> First, the party seeking issuance of the writ [must] have no other adequate means to attain the relief he desires—a condition designed to ensure that the writ will not be used as a substitute for the regular appeals process. Second, the petitioner must satisfy the burden of showing that [his] right to issuance of the writ is clear and indisputable. Third, even if the first two prerequisites have been met, the issuing court, in the exercise of its discretion,

---

[1] The named defendants are two Louisiana officials, but that is only because *Ex parte Young* allows injunctive relief against the State in suits against state officers in their official capacities. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 114 n.25 (1984) ("To say that injunctive relief against State officials acting in their official capacity does not run against the State is to resort to the fictions that characterize the dissent's theories.").

3

must be satisfied that the writ is appropriate under the circumstances.

*Id.* at 380–81 (alterations in original) (quotations omitted).

"These hurdles, however demanding, are not insuperable." *Id.* at 381. They simply reserve the writ "for really extraordinary causes." *Id.* at 380 (quoting *Ex parte Fahey*, 332 U.S. 258, 259–60 (1947)). And in extraordinary cases, mandamus petitions "serve as useful 'safety valve[s]' for promptly correcting serious errors." *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 111 (2009) (alteration in original).

"The clearest traditional office of mandamus and prohibition has been to control jurisdictional excesses, whether the lower court has acted without power or has refused to act when it had no power to refuse." 16 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 3933.1 (3d ed.) [hereinafter WRIGHT & MILLER]. That was true at common law. *See* 3 WILLIAM BLACKSTONE, COMMENTARIES *112 (explaining the writ of prohibition issued to "any inferior court, commanding them to cease" a case that did "not belong to that jurisdiction").[2] And it's true today. "The traditional use of the writ in aid of appellate jurisdiction both at common law and in the federal courts has been to confine [the court against which mandamus is sought] to a lawful exercise of its prescribed jurisdiction." *Cheney*, 542 U.S. at 380 (quoting *Roche v. Evaporated Milk Ass'n*, 319 U.S. 21, 26 (1943)); *see also* 16 WRIGHT & MILLER § 3932 ("The most common traditional statement is that the extraordinary writs are available to a court of appeals to prevent a district court from acting

---

[2] In keeping with modern practice, we do not distinguish between mandamus and prohibition. "Once power is found to issue a writ, little concern is shown to define the possible technical and historic differences between mandamus and prohibition." 16 WRIGHT & MILLER § 3932.2. Considering a petition for mandamus, or prohibition in the alternative, the Supreme Court explained that "[i]t does not matter very much in what form an extraordinary remedy is afforded." *In re Simons*, 247 U.S. 231, 239–40 (1918).

beyond its jurisdiction, or to compel it to take action that it lacks power to withhold.").

That's not to say mandamus was or is limited to jurisdictional issues. Although it issued "in theory to prevent [a judge] from exceeding his jurisdiction or to require him to exercise it," it issued "[i]n practice" for "all manner of errors." *Pulliam v. Allen*, 466 U.S. 522, 532–33 (1984). But even as the use of mandamus expanded, the jurisdictional core remained. That's why mandamus is described as "an expeditious and effective means of confining the inferior court to a lawful exercise of its prescribed jurisdiction, or of compelling it to exercise its authority when it is its duty to do so." *Ex parte Republic of Peru*, 318 U.S. 578, 583 (1943).

### III.

In keeping with the traditional office of the writ of mandamus, we start with the jurisdictional errors below. And we consider whether, in the extraordinary circumstances presented here, those jurisdictional errors give the State a right to the writ. It's a close question, even in these extraordinary circumstances. But in our view, the State has carried its burden on the first prong of the mandamus standard.

### A.

Our mandamus precedent has long distinguished between discretionary decisions and non-discretionary duties. If the issue "is one committed to the discretion of the trial court, a clear and indisputable right to the issuance of the writ of mandamus will arise only if the district court has clearly abused its discretion, such that it amounts to a judicial usurpation of power." *In re First S. Sav. Ass'n*, 820 F.2d 700, 707 (5th Cir. 1987). But if the district court has violated a non-discretionary duty, the petitioner necessarily has a clear and indisputable right to relief. *See United States ex rel. Bernardin v. Duell*, 172

U.S. 576, 582 (1899) (holding "the writ of mandamus will not ordinarily be granted . . . unless the duty sought to be enforced is clear and indisputable"); *In re Digicon Marine, Inc.*, 966 F.2d 158, 160 (5th Cir. 1992) (granting mandamus because "the district court had no discretion" (quotation omitted)); *In re Estelle*, 516 F.2d 480, 483 (5th Cir. 1975) ("[A]n extraordinary Writ may be appropriate to prevent a trial court from making a discretionary decision where a statute effectively removes the decision from the realm of discretion."); *SEC v. Krentzman*, 397 F.2d 55, 59 (5th Cir. 1968) (holding mandamus was appropriate because the district court "exercised what he thought to be a discretionary power which he did not possess").

A district court's obligation to consider a challenge to its jurisdiction is non-discretionary.  When the defendant "challenge[s] the jurisdiction of the district court in an appropriate manner," that court has a "duty of making further inquiry as to its own jurisdiction."  *Opelika Nursing Home, Inc. v. Richardson*, 448 F.2d 658, 666 (5th Cir. 1971).  "[F]ederal courts are under an independent obligation to examine their own jurisdiction, and standing 'is perhaps the most important of [the jurisdictional] doctrines.'"  *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (quoting *Allen v. Wright*, 468 U.S. 737, 750 (1984)); *see also United States v. Hays*, 515 U.S. 737, 742 (1995).  This obligation applies to each statute being challenged.  *See, e.g.*, *Lewis v. Casey*, 518 U.S. 343, 358 & n.6 (1996).

We hasten to emphasize, however, that a district court's failure to consider jurisdiction does not always create a right to the writ.  That failure is extraordinary here for four reasons.  First, Louisiana raised forceful objections to the district court's jurisdiction.  The State filed a motion to dismiss the first complaint and another jurisdictional challenge to the Amended Complaint.  Second, the district court recognized the defendants' jurisdictional objections

and even said they appeared "persuasive." Third, the court nonetheless found it "untenable" to make Plaintiffs establish standing because doing so would make it harder for them to succeed on the merits. March 29, 2019 Order, Doc. 103 at 15. Fourth, as we explain in Part III.B below, at least some of the State's jurisdictional arguments appear meritorious. This case is thus not about a mere jurisdictional error. Nor is it about a mere failure to spot a jurisdictional issue. It is closer to a "refusal to be guided by established doctrines governing jurisdiction." *Belcher v. Grooms*, 406 F.2d 14, 16 (5th Cir. 1968). And as we explain in Part IV below, the failure to rule on these standing issues now—statute-by-statute and regulation-by-regulation—could result in significant discovery costs borne by the State's taxpayers. In these circumstances, the failure to perform a non-discretionary jurisdictional inquiry satisfies the first prong of the mandamus standard.

B.

Our conclusion is reinforced by the obvious standing problems associated with some of Plaintiffs' challenges.

1.

It is now beyond cavil that plaintiffs must establish standing for each and every provision they challenge. *See, e.g.*, *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018); *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 353 (2006); *Lewis*, 518 U.S. at 358 & n.6; *Blum v. Yaretsky*, 457 U.S. 991, 999 (1982). Take *Lewis v. Casey* for example. In that case, 22 prisoners filed a class action against the Arizona Department of Corrections ("ADOC") for violating their constitutional right to access the courts. 518 U.S. at 346. The district court "identified a variety of shortcomings of the ADOC system, in matters ranging from the training of library staff, to the updating of legal materials, to the availability of photocopying services." *Ibid*. It also found inmates in "lockdown" did not

have physical access to the prison library. *Id.* at 347. And illiterate or non-English-speaking inmates did not have adequate legal assistance. *Ibid.* So the district court appointed a special master, who conducted an eight-month investigation of the prison system. *Ibid.* Then, working with the special master, the district court imposed a 25-page injunction on ADOC. Among other things:

> [i]t specified in minute detail the times that libraries were to be kept open, the number of hours of library use to which each inmate was entitled (10 per week), the minimal educational requirements for prison librarians (a library science degree, law degree, or paralegal degree), the content of a videotaped legal-research course for inmates (to be prepared by persons appointed by the Special Master but funded by ADOC), and similar matters.

*Ibid.* The district court said every prison library must contain, "*inter alia*, the Arizona Digest, the Modern Federal Practice Digest, Corpus Juris Secundum, and a full set of the United States Code Annotated, and . . . provide a 30–40 hour videotaped legal research course covering relevant tort and civil law, including immigration and family issues." *Id.* at 355 n.5 (quotation omitted).

That is not how Article III works. In vacating the injunction, the Supreme Court held that plaintiffs can seek judicial review of state laws and regulations *only* insofar as they show a plaintiff was (or imminently will be) *actually* injured by a particular legal provision. *See id.* at 349. It is not enough, the Court held, that the plaintiffs or the district court identified a constitutional problem with the ADOC libraries. *See id.* at 357. Nor could the plaintiffs identify one injury and then bootstrap it to complain about others. *See id.* at 358. That's because:

> standing is not dispensed in gross. If the right to complain of one administrative deficiency automatically conferred the right to complain of all administrative deficiencies, any citizen aggrieved in one respect could bring the whole structure of state

administration before the courts for review. *That is of course not the law.* As we have said, "[n]or does a plaintiff who has been subject to injurious conduct of one kind possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject."

*Id.* at 358 n.6 (emphasis added) (quoting *Blum*, 457 U.S. at 999). Applying that rule, the Court identified only two plaintiffs who suffered *actual* injuries: A prisoner named Bartholic needed "special services" to file an action because he was illiterate. *Id.* at 358. And a prisoner named Harris was unable to file an action because he was a slow reader. *Id.* at 356. The plaintiffs were entitled to invoke the powers of the federal courts to remedy only those actual injuries.

All of this makes sense because, "under our constitutional system[,] courts are not roving commissions assigned to pass judgment on the validity of the Nation's laws." *Broadrick v. Oklahoma*, 413 U.S. 601, 610–11 (1973). Instead, federal courts are limited to deciding "cases" and "controversies." U.S. CONST. art. III, § 2. Indeed, "[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 37 (1976). And "[t]o state a case or controversy under Article III, a plaintiff must establish standing." *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 132 (2011). Therefore, in the absence of standing, the court has no "power to declare the law." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (quoting *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868)). The distinction between the courts and the political branches "would be obliterated if, to invoke intervention of the courts, no actual or imminent harm were needed, but merely the status of being subject to a governmental institution that was not organized or managed properly." *Lewis*, 518 U.S. at 350.

These same principles apply in abortion cases. For example, in *K.P. v. LeBlanc*, 729 F.3d 427 (5th Cir. 2013), we analyzed abortion providers' standing as it related to each provision they challenged. *Id.* at 437. We concluded they lacked standing to challenge one of the provisions. *Ibid.* As a result, we vacated the district court's judgment regarding that provision and "dismiss[ed] that claim for want of jurisdiction." *Id.* at 443.[3]

2.

In this case, Plaintiffs have proffered ample allegations to support their contention that the State of Louisiana is not regulating abortion properly. But Article III demands much more. *See Lewis*, 518 U.S. at 350. To ensure that standing is not dispensed in gross, the district court must analyze Plaintiffs' standing to challenge each provision of law at issue.[4] It did not do so. That's

---

[3] At oral argument, Plaintiffs' counsel insisted *Doe v. Bolton*, 410 U.S. 179 (1973), is to the contrary. It is not. In that case, the Supreme Court said abortion providers had standing to challenge Georgia's abortion laws, "despite the fact that the record does not disclose that any one of them has been prosecuted, or threatened with prosecution, for violation of the State's abortion statutes." *Id.* at 188. That is the well-settled rule— applicable to abortion laws and others alike—that a would-be plaintiff need not violate a criminal provision and risk prosecution to challenge it. *See, e.g.*, *Abbott Labs. v. Gardner*, 387 U.S. 136, 152–53 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977); *cf. Toilet Goods Ass'n, Inc. v. Gardner*, 387 U.S. 158, 163–64 (1967). In *Doe*, the abortion providers alleged they wanted to do something—provide abortions—that the state law prohibited. And the Court held that was a sufficient injury to justify their Article III standing. *See* 410 U.S. at 188–89. At no point did the Court suggest the *Doe* plaintiffs had standing to challenge state legal provisions that the plaintiffs did not want to violate. *Doe* therefore does not stand for the proposition that plaintiffs can challenge provisions that do not affect or injure them in any way.

[4] Our understanding of each provision at issue differs somewhat from Plaintiffs'. In the "preliminary statement" of their operative complaint, Plaintiffs say they are challenging "twenty-six laws." *E.g.*, Am. Compl. ¶ 3. But in the body of the complaint, Plaintiffs sometimes count one regulation as a single "law"; other times they count a handful of subsections as a single "law"; other times they count multiple regulations as a single "law"; and still other times they count a single subsection as a single "law." *E.g.*, *id.* ¶¶ 57, 59(a), 59(b), 59(i), 59(j), 60(c), 60(d), 60(f), 60(g), 60(h), 60(i). That's confusing. By our count, Plaintiffs' complaint challenges many more than "twenty-six laws." Some of the provisions

10

especially problematic, because at least four categories of Plaintiffs' legal challenges appear to fall short of Article III's demands.

First, Plaintiffs challenge some legal provisions that do not appear to do anything. For example, they challenge the statutory title. *See* LA. REV. STAT. § 40:2175.1 ("This Part may be cited as the 'Outpatient Abortion Facility Licensing Law.'"); Am. Compl. ¶¶ 5(i), 57 (challenging § 40:2175.1). They challenge the statutory purpose. *See* LA. REV. STAT. § 40:2175.2 (noting the purpose of the law is to provide safe access to abortion and that rules promulgated to implement the law "shall not impose a legally significant burden on a woman's freedom to decide whether to terminate her pregnancy"); Am. Compl. ¶¶ 5(i), 57 (challenging § 40:2175.2). And they challenge each and every regulatory definition. *See* LA. ADMIN. CODE tit. 48, pt. I, § 4401 (providing numerous definitions, including defining "Patient" as "the woman receiving services from an outpatient abortion facility"); Am. Compl. ¶¶ 5(ii), 58–59(a) (challenging the entirety of § 4401). If Plaintiffs want to include these provisions in their omnibus challenge, they must now plead (and later prove) that they suffer injury traceable to these provisions and redressable by an injunction against them. *See, e.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

_____

they challenge as "one"—such as title 48 of the Louisiana Administrative Code, part I, § 4445—in fact contain numerous separate legal requirements. *See* Am. Compl. ¶¶ 5(ii), 59(k) (challenging § 4445). It is irrelevant for purposes of standing that separate legal requirements are grouped together in a single section of the code. After all, a single section of a statutory code can be the product of many bills passed over many years, and a single section of an administrative code can be the result of several rulemakings. Plaintiffs must demonstrate all the elements of standing for each provision they seek to challenge. And they must do so at the same level of granularity we use in the following pages.

11

No. 19-30353

Second, Plaintiffs challenge a bevy of legal provisions that appear incapable of injuring them. For example, they challenge individual provisions requiring:

- an abortion facility to have a distinct name that does not "mislead the patient or their family into believing it is owned, endorsed, or operated by the state of Louisiana," LA. ADMIN. CODE tit. 48, pt. I, § 4403(F);

- an abortion facility to maintain the "privacy and confidentiality of patient medical records," LA. ADMIN. CODE tit. 48, pt. I, § 4425(A)(3);

- "safeguards" to protect patient records from "loss or damage," LA. ADMIN. CODE tit. 48, pt. I, § 4425(A)(4);

- an abortion facility to comply "with all applicable state laws for the reporting of crimes against a child that include but are not limited to: a. rape; b. sexual battery; c. incest; and d. carnal knowledge of a juvenile," LA. ADMIN. CODE tit. 48, pt. I, § 4425(F)(2);

- a physician to report an abortion to the Louisiana Department of Health, LA. REV. STAT. § 40:1061.11(C);[5]

- a physician to report "a serious adverse event" to the U.S. Food and Drug Administration, LA. REV. STAT. § 40:1061.11(D);[6]

- an abortion facility to have sanitary "toilet facilities," including hot and cold water and some method for drying users' hands, LA. ADMIN. CODE tit. 48, pt. I, § 4445(A)(5);

- an abortion facility to display a "Forced Abortion Prevention" sign, LA. ADMIN. CODE tit. 48, pt. I, § 4445(G)(1); and

---

[5] Plaintiffs' challenge to this provision is particularly difficult to understand because they do not challenge their independent reporting obligation under Louisiana Revised Statute § 40:1061.21. Given that § 40:1061.21 requires abortion providers to report abortions to the State, it would seem any burden associated with that reporting cannot be attributed to § 40:1061.11(C). *See, e.g., Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 412–13 (2013) (holding injury cannot be attributed to law *A* if it could be caused by law *B*).

[6] Plaintiffs' challenge to this provision is also difficult to understand because they have an independent obligation to report abortion complications under Louisiana Revised Statute § 40:1061.21. And yet they do not challenge that provision. *See Clapper*, 568 U.S. at 412–13; *supra* note 5.

- an abortion facility to "post information regarding the National Human Trafficking Resource Center Hotline," LA. ADMIN. CODE tit. 48, pt. I, § 4445(H).

*See* Am. Compl. ¶¶ 5, 59, 60 (challenging these provisions). Some of these provisions cannot apply to Plaintiffs. For example, Plaintiffs have not alleged that they began constructing or intended to construct an abortion facility after the enactment of a 2015 legal provision governing the standards for facility construction.[7] And Plaintiffs do not allege that, but for Louisiana law, they would not have sanitary toilets, hot and cold water, and signs regarding forced abortions and human trafficking. Nor do Plaintiffs allege that they would provide these things in a different way, but for Louisiana law. Similarly, Plaintiffs do not allege any injury from their obligation to maintain the privacy and confidentiality of their patients' records—to the contrary, Plaintiffs say they *want* to "safeguard" this information. *See* Am. Compl. ¶ 132. To the extent the challenged regulations require Plaintiffs to do what they've already been doing and want to keep doing, they do not have standing to challenge them.[8] *See Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009) (explaining plaintiffs "can demonstrate standing only if application of the regulations by the Government will affect them" (emphasis omitted)).

---

[7] Plaintiffs' counsel indicated that the abortion facility has been in the same physical space since it began operations in 1980. Oral Argument at 24:48–25:01. But we do not hold that counsel's statement constitutes a binding admission of fact.

[8] It is no answer to say the "[Outpatient Abortion Facility Licensing Law] permits a clinic's license to be revoked upon violation of any regulation, [so the Louisiana Department of Health] could deny or revoke a license if a restroom were temporarily out of paper towels . . . ." Am. Compl. ¶ 71. It is speculative to allege Plaintiffs would lose their license for temporarily running out of paper towels. *See Lujan*, 504 U.S. at 561 (holding the irreducible constitutional minimum injury for standing purposes cannot be "speculative"). And in all events, Plaintiffs separately challenge the license-revocation provision; whether they have standing to do so is separate and apart from whether they are injured by the requirement to have sanitary bathrooms.

Third, Plaintiffs challenge some legal provisions that theoretically *could* apply to them—but without any allegation that they *would*.  For example, they challenge individual provisions requiring:

- a "plan review" for an "initial licensure, major renovation, and change of location"—without any allegation that they need an initial license or are planning a major renovation or change of location, LA. ADMIN. CODE tit. 48, pt. I, § 4403(H);

- a "physical environment survey" for a major renovation or change of location—without any allegation that they're planning a major renovation or change of location, LA. ADMIN. CODE tit. 48, pt. I, §§ 4403(H)(3)(ii), 4407(D)(5);

- certain flooring and wall finishes for abortion facilities that undergo a major renovation or change of location—without any allegation that they're planning a major renovation or change of location, LA. ADMIN. CODE tit. 48, pt. I, § 4445(A)(6);

- a "soiled utility room" containing, among other things, a trash can in abortion facilities that undergo a major renovation or change of location—without any allegation that they're planning a major renovation or change of location, LA. ADMIN. CODE tit. 48, pt. I, § 4445(E)(1);

- a stretcher, a wheelchair, and hallways to accommodate them in abortion facilities that undergo a major renovation or change of location—without any allegation that they're planning a major renovation or change of location, LA. ADMIN. CODE tit. 48, pt. I, § 4445(E)(4)–(5);

- sanitary laundry facilities in abortion facilities that include an "in-house laundry"—without any allegation they have an "in-house laundry," LA. ADMIN. CODE tit. 48, pt. I, § 4445(F);

- an abortion facility to have "qualified personnel" necessary to provide patient care—without any allegation they want to hire unqualified personnel, LA. ADMIN. CODE tit. 48, pt. I, § 4423(A);

- an abortion facility to "employ qualified medical staff" and "qualified nursing staff to meet the needs of the patients"—without any allegation they want to hire unqualified medical staff or don't wish to meet the needs of patients, LA. ADMIN. CODE tit. 48, pt. I, § 4423(C)–(D);

- an administrator to be at least 18 years old and to have a high school diploma or the equivalent—without any allegation they wish to hire an administrator who is under 18 or does not have a high school diploma or the equivalent, LA. ADMIN. CODE tit. 48, pt. I, § 4423(B)(1);

- a "qualified person" to perform any ultrasound—without any allegation they wish to hire an unqualified person to perform the ultrasound, LA. REV. STAT. § 40:1061.10(D)(1); and

- the Louisiana Department of Health to promulgate rules for the safe provision of abortion—without any allegation that the delegation of rulemaking is unconstitutional independent of any particular rule, LA. REV. STAT. § 40:2175.5.

*See* Am. Compl. ¶¶ 5, 59, 60 (challenging these provisions). It's theoretically possible these provisions could injure Plaintiffs. But Article III requires more than theoretical possibilities. *See Simon*, 426 U.S. at 44 ("[U]nadorned speculation will not suffice to invoke the federal judicial power."). Absent allegations that Plaintiffs will trigger these requirements in the near future, they have no standing to challenge them. *See Clapper*, 568 U.S. at 409 ("[W]e have repeatedly reiterated that threatened injury must be *certainly impending* to constitute injury in fact, and that allegations of *possible* future injury are not sufficient." (quotations and brackets omitted)).

Fourth, Plaintiffs challenge some legal provisions that benefit rather than harm women seeking abortions. In *Singleton v. Wulff*, 428 U.S. 106 (1976), a plurality of the Court recognized abortion providers' third-party standing to challenge laws that place undue burdens on women seeking abortions. *See id.* at 118 (plurality opinion). That practice continues today. *See, e.g.*, *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016); *cf. June Medical Services L.L.C. v. Gee*, 905 F.3d 787 (5th Cir. 2018), *cert. granted*, 2019 WL 4889928 (U.S. Oct. 4, 2019) (No. 18-1460) (granting certiorari to consider whether abortion providers can be presumed to have third-party standing). The rationale appears to be that abortion providers and women seeking

abortions have a unity of interest in challenging laws that regulate the procedure. Whatever the wisdom of that rationale, *see Whole Woman's Health*, 136 S. Ct. at 2322–23 (Thomas, J., dissenting), some of Plaintiffs' challenges seem inconsistent with it. For example, they challenge a provision that prohibits them from charging for an abortion in the 24 hours after a woman gives informed consent. *See* LA. ADMIN. CODE tit. 48, pt. I, § 4431(G)(5)(c); Am. Compl. ¶ 59(f). Plaintiffs challenge another provision requiring them to give women instructions for post-operative follow-up care. *See* LA. ADMIN. CODE tit. 48, pt. I, § 4437(B)(1); Am. Compl. ¶ 59(j). It is not obvious how these provisions could injure women seeking abortions. They might injure abortion providers who'd otherwise demand money during the 24-hour post-consent period or who'd otherwise not give women instructions for post-operative follow-up care. But Plaintiffs do not allege they fall in either category. And even if they did, it's not obvious they have standing to challenge laws that *help* women.

The foregoing is not meant to be an exhaustive jurisdictional analysis of Plaintiffs' allegations. Perhaps they lack standing in ways not explored here. Perhaps they have standing in others. We leave that for the district court to decide on a provision-by-provision basis. *See supra* note 4. We recognize that analyzing standing at this level of granularity can be tedious in a sweeping challenge like this one. But it's what Article III requires.

## IV.

To secure mandamus relief, Louisiana also must show it has "no other adequate means to attain the relief [it] desires." *Cheney*, 542 U.S. at 380 (quotation omitted). This requirement "ensure[s] that the writ will not be used as a substitute for the regular appeals process." *Id.* at 380–81. Here, Louisiana

has shown a later appeal would be inadequate to correct the jurisdictional errors described above.

## A.

Ordinarily, a district court's erroneous denial of a Rule 12(b)(1) jurisdictional objection does not satisfy the second mandamus requirement. It is always true that an erroneous failure to dismiss will result in some inconvenient discovery and unnecessary litigation. "But that inconvenience is one which we must take it Congress contemplated in providing that only final judgments should be reviewable." *Roche*, 319 U.S. at 30; *see also Cheney*, 542 U.S. at 381 (noting that "interlocutory appellate review is unavailable, through mandamus or otherwise," for "*ordinary* discovery orders" (emphasis added)); *Plekowski v. Ralston-Purina Co.*, 557 F.2d 1218, 1220 (5th Cir. 1977) (similar).

Instead, we reserve this extraordinary remedy for special situations where the unlawful exercise of federal jurisdiction imposes extraordinary harms. For example, we have held mandamus can be appropriate in some circumstances to challenge the denial of venue-transfer motions. *See, e.g.*, *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 309 (5th Cir. 2008) (en banc); *In re Horseshoe Entm't*, 337 F.3d 429, 432 (5th Cir. 2003); 16 WRIGHT & MILLER § 3935.4. One of our sister circuits granted mandamus to direct the dismissal of a complaint raising "a basic and undecided question" of civil procedure. *In re BP Lubricants USA Inc.*, 637 F.3d 1307, 1313 (Fed. Cir. 2011) (quotation omitted). And the Supreme Court used mandamus to review the denial of a motion to dismiss for lack of jurisdiction over a foreign boat. *See Republic of Peru*, 318 U.S. at 589–90.

The unlawful assertion of federal power over a matter of state sovereignty qualifies as another such special situation. *See In re Univ. of Mich.*, 936 F.3d 460, 465 (6th Cir. 2019) (holding federalism concerns justified

granting mandamus when a district court improperly "invoke[ed] federal power to haul a high-ranking state official into federal court"). That's why the Supreme Court "has issued the writ to restrain a lower court when its actions would threaten the separation of powers by embarrassing the executive arm of the Government, *or result in the intrusion by the federal judiciary on a delicate area of federal-state relations.*" *Cheney*, 542 U.S. at 381 (emphasis added) (quotations and brackets omitted). For example, in *Maryland v. Soper*, 270 U.S. 9 (1926), the State charged four federal prohibition agents with murder. The officers removed to federal court. Then the State petitioned for mandamus to have the case remanded to state court. The officers opposed mandamus by arguing the removal was "a question within the regular judicial function of the District Court to decide, and that this court should not interfere thus prematurely with its exercise." *Id.* at 28. The Supreme Court rejected that argument and held a later appeal was inadequate when "the jurisdiction of the courts of a state to try offenses against its own laws and in violation of its own peace and dignity is wrested from it by the order of an inferior federal court." *Id.* at 29. As one of our sister circuits has put it, "[t]he crux of these authorities" is "that federalism concerns justify review by mandamus." *California v. Mesa*, 813 F.2d 960, 963 (9th Cir. 1987), *aff'd*, 489 U.S. 121 (1989).

## B.

Here, the combination of five federalism concerns makes this a special circumstance and distinguishes it from an ordinary case: (1) A sovereign State is requesting the writ; (2) Plaintiffs seek sweeping review of an entire body of state law; (3) Plaintiffs seek structural injunctions that would give the district court *de facto* control of state law; (4) the type of discovery waiting on the other side of Louisiana's motion to dismiss is categorically different than what

18

awaits an ordinary civil litigant; and (5) the ordinary civil litigant cannot demand attorneys' fees from the State's taxpayers.

First, the State of Louisiana is the true defendant in this case. *See supra* note 1. The Supreme Court has long "recognized that States are not normal litigants." *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007); *see also id.* at 520 (holding States are "entitled to special solicitude in our standing analysis"). They're "residuary sovereigns and joint participants in the governance of the Nation." *Alden v. Maine*, 527 U.S. 706, 748 (1999). And, as a consequence, the Supreme Court has long recognized States' special rights to seek relief in federal court. *See, e.g., Massachusetts*, 549 U.S. at 519 (holding "Massachusetts' well-founded desire to preserve its sovereign territory" gives it standing to challenge an EPA decision); *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982) (noting a State can seek relief based on its "quasi-sovereign interest in not being discriminatorily denied its rightful status in the federal system"); *Texas v. United States*, 809 F.3d 134, 153 (5th Cir. 2015) ("[S]tates have a sovereign interest in the power to create and enforce a legal code." (alteration in original) (quotation omitted)), *aff'd by an equally divided court*, 136 S. Ct. 2271 (2016).

Second, Plaintiffs are seeking judicial review of an entire body of state statutory and regulatory law. *See* Am. Compl. at 58–60. Judicial review of any state law implicates obvious federalism concerns. *See Morrow v. Harwell*, 768 F.2d 619, 627 (5th Cir. 1985) (emphasizing the "extraordinary" nature of "federal injunctive relief" despite "its familiarity to federal courts, gained particularly in desegregation cases over the past thirty years"). Those concerns are exponentially more acute when a federal court entertains a challenge to an entire body of state law.

Third, Plaintiffs are seeking a structural injunction and continuing federal supervision of the State of Louisiana. Such expansive use of equitable remedies has long been recognized as a threat to federalism. The Founders worried "that the equity power would" so empower federal courts that it "would result in . . . the 'entire subversion of the legislative, executive and judicial powers of the individual states.'" *Missouri v. Jenkins*, 515 U.S. 70, 128–29 (1995) (Thomas, J., concurring) (quoting Brutus XI). Responding to Brutus and defending the proposed Constitution, "Hamilton sought to narrow the expansive Anti-Federalist reading of inherent judicial equity power" and "described Article III 'equity' as a jurisdiction over certain types of cases rather than as a broad remedial power." *Id.* at 130 (describing *The Federalist* No. 83).

The same concerns apply today: Federalism is a "clear restraint[] on the use of equity power" because "[a] structural reform decree eviscerates a State's discretionary authority over its own program and budgets." *Id.* at 131; *see also Horne v. Flores*, 557 U.S. 433, 448 (2009) ("[I]nstitutional reform injunctions often raise sensitive federalism concerns."). Courts are properly reluctant to grant such relief because of the federalism burdens it imposes. *See Morrow*, 768 F.2d at 627 ("There is no question but that the passive remedy of a declaratory judgment is far less intrusive into state functions than injunctive relief that affirmatively commands specific future behavior under the threat of the court's contempt powers."). The Supreme Court has made clear that sweeping requests for "intrusive and unworkable" injunctions are nonjusticiable because they threaten "the special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law." *O'Shea v. Littleton*, 414 U.S. 488, 500 (1974) (quotation and brackets omitted). And the Court has even shaped substantive federal law around the assumption that it must avoid "permanent judicial intervention in the conduct

of governmental operations to a degree inconsistent with sound principles of federalism and the separation of powers." *Garcetti v. Ceballos*, 547 U.S. 410, 423 (2006). After all, "[t]he Federal Government does not . . . have a general right to review and veto state enactments before they go into effect." *Shelby County v. Holder*, 570 U.S. 529, 542 (2013).

Plaintiffs are seeking this same sort of sweeping federal supervision of the State. They want the district court to issue permanent injunctive relief against a slew of state statutes and regulations, to "retain jurisdiction," and to provide "judicial oversight" of state actors. Mem. in Opp'n to Mot. to Dismiss, Doc. 32 at 10; Am. Compl. at 59–60. They treat the desegregation cases as exemplars for court "supervision." Mem. in Opp'n to Mot. to Dismiss, Doc. 32, at 10. Regardless of whether the district court ever orders such sweeping relief, the mere prospect of it increases the stakes of this litigation exponentially as compared to an ordinary civil case.

Fourth, discovery in this case would be categorically different from discovery in an ordinary case. In the ordinary case, the plaintiff who defeats a motion to dismiss does not get to demand written discovery and depositions of high-ranking government officials. Nor does the ordinary plaintiff get to demand access to documents and communications that would otherwise be protected by legislative and executive privilege. But such discovery demands are all too common where, as here, plaintiffs claim the government acted with an invidious purpose. *See, e.g.*, *Tummino v. Torti*, 603 F. Supp. 2d 519 (E.D.N.Y. 2009) (detailing extensive discovery taken from senior FDA and other executive branch officials in litigation over "Plan B" pill); *cf. Texas v. Holder*, No. 12-128, 2012 WL 13070060 (D.D.C. June 5, 2012) (ordering extensive discovery of state officials in voting-rights suit and ordering a second

deposition of a sitting state senator).  For example, in an abortion case from one of our sister circuits:

> [P]laintiffs spent much time on discovery. They noticed the depositions of [Guam] Governor Joseph F. Ada; June S. Mair, a legislative staffer to the senator who had sponsored the abortion statute; and Police Chief Adolf P. Sgambelluri. They also sought and obtained such items as drafts of the abortion bills; memos from the attorney general to the police chief; crime statistics; memos from the police chief to his staff; and copies of the governor's speeches. The discovery effort spawned a good bit of satellite litigation. For example, the parties disagreed about whether Governor Ada could be deposed. The matter was briefed and argued and, in an inexplicable ruling, the district court permitted the deposition.

*Guam Soc'y of Obstetricians & Gynecologists v. Ada*, 100 F.3d 691, 707 (9th Cir. 1996) (citations and footnotes omitted).

The plaintiffs in this case have propounded extensive initial discovery requests that likewise tread on sensitive areas of state decisionmaking.  *See* Mot. for Partial Dismissal, Doc. 95-2 at 1–11.  Numerous appellate courts have recognized the appropriateness of mandamus in a lawsuit involving discovery that would hamper important state interests.  *See, e.g.*, *In re Lombardi*, 741 F.3d 888, 895 (8th Cir. 2014) (en banc); *In re County of Erie*, 473 F.3d 413, 419 (2d Cir. 2007); *In re Wilkinson*, 137 F.3d 911, 914 (6th Cir. 1998).

Consider the recent case of *In re Kemp*, 894 F.3d 900 (8th Cir. 2018). There a state judge sued the Arkansas Supreme Court because it had removed him from certain cases. *Id.* at 904–05.  The disgruntled judge sought extensive discovery, and the district court denied a motion to dismiss.   Seeking mandamus to stop the discovery and dismiss the claims, the Arkansas Supreme Court Justices argued that discovery of internal state deliberations would threaten "judicial independence *and federalism*." *Id.* at 905 (emphasis added).  The court expressed no opinion as to the propriety of the discovery

requests but noted the requests implicated "significant and complex" concerns. *Ibid.* Moreover, the requests themselves justified the granting of mandamus because their intrusive nature risked leading to "discovery of irrelevant information" that would be "oppressive" to "important state interests." *Id.* at 906. Mandamus was granted. *Id.* at 910. To our sister circuit, applicable privileges were not enough to protect the State's interests. *Id.* at 906.

Similarly, the Supreme Court has told us the potential availability of executive privilege is not an adequate protection against such discovery requests. *See Cheney*, 542 U.S. at 380–91. Instead, the primary protection comes from the exacting standards for Article III jurisdiction—enforceable by mandamus if necessary. *Cf. In re Univ. of Mich.*, 936 F.3d at 466–67. Where the discovery on the other side of a motion to dismiss is extraordinary, it is all the more important to apply the Constitution's jurisdictional limits correctly at the threshold.

The fifth and final federalism consideration that distinguishes this from an ordinary civil case is fee-shifting. "In the United States, the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser." *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247 (1975). But that is not true in cases like this one. Here, Plaintiffs have sued state officials under 42 U.S.C. § 1983. And with that cause of action comes the tantalizing promise of attorneys' fees under 42 U.S.C. § 1988.

This means that the State of Louisiana could be on the hook for *both* sides' fees. At argument, Plaintiffs' counsel wished for "a nickel for every time I represented a defendant who is concerned about the time, cost, and burden of discovery." Oral Argument at 38:42–48. But unlike an ordinary private defendant, Louisiana is at risk of having to pay its costs *and* Plaintiffs' fees and expenses.

23

Those fees and expenses can be astronomical. In *Whole Woman's Health v. Hellerstedt*—which Plaintiffs invoke as the principal precedent for this suit—the abortion clinic submitted a fee application for more than $4.5 million.[9] That bill included over $1.6 million in fees and expenses for Morrison & Foerster, the global law firm retained by the clinic. And the *Whole Woman's Health* plaintiffs did not attempt to invalidate the entirety of Texas's abortion laws or to place the State under federal judicial supervision. Regardless of whether Plaintiffs prevail in this case, the mere prospect of shifting Debevoise & Plimpton's multi-million-dollar fee request to the shoulders of Louisiana's taxpayers will force the State to litigate this case in ways that are far from ordinary.

All five of these factors combine to make this an extraordinary case. And it is one of the "special situations" in which a later appeal is in adequate. 16 WRIGHT & MILLER § 3932.1.

---

[9] The plaintiffs' fee application included the following requests:

| | |
|---|---|
| Attorneys' fees for Center for Reproductive Rights | $2,754,503.00 |
| Expenses for Center for Reproductive Rights | $70,462.41 |
| Attorneys' fees for Morrison & Foerster LLP | $1,523,768.75 |
| Expenses for Morrison & Foerster LLP | $87,964.45 |
| Attorneys' fees for O'Connell & Soifer LLP | $111,231.25 |
| Attorneys' fees for John H. Bucy II | $3,152.50 |
| Expenses for Leah M. Litman | $357.20 |
| **Total** | **$4,551,439.56** |

Plaintiffs' Motion for Attorneys' Fees at 1, *Whole Woman's Health v. Hellerstedt*, No. 1:14-cv-284-LY (W.D. Tex. Oct. 7, 2016), ECF No. 245. The fee application spawned additional litigation and a supplemental request for an additional $100,000 in fees and expenses. *See* Order at 14–15, *Whole Woman's Health v. Hellerstedt*, No. 1:14-cv-284-LY (W.D. Tex. Aug. 9, 2019), ECF No. 297. Almost three years after the plaintiffs filed the application, the district court issued a 46-page opinion awarding approximately $2.5 million in fees and expenses. *See id.* at 46.

V.

The district court's failure to consider the State's jurisdictional challenges and the inadequacy of a later appeal support issuance of the writ. We nonetheless exercise our discretion not to issue it at this time.

As Wright and Miller explain, the writ of mandamus is a discretionary one: "The availability of prerogative writ review has long been held a matter of appellate discretion. Discretion is involved in defining both the circumstances that justify exercise of writ power and also the reasons that may justify denial of a writ even though the circumstances might justify a grant." 16 WRIGHT & MILLER § 3933; *see also Cheney*, 542 U.S. at 381 (noting "even if the first two prerequisites have been met, the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances"). Here, the State falls short. That's for two reasons. First, it's not clear from the district court's order how it would resolve the State's jurisdictional challenge. And second, much of the State's argument in its mandamus petition goes beyond jurisdiction. In particular, the State argues that Plaintiffs' "cumulative-effects challenge" is not cognizable. But that challenge might change after the district court conducts its claim-by-claim analysis of Plaintiffs' standing. So in our view, resolution of whether that challenge is cognizable should await the district court's jurisdictional analysis.

A.

As noted above, the district court has not yet addressed the State's jurisdictional arguments. The district court said it would be "untenable" to consider jurisdiction at this stage. That was wrong; the Supreme Court has repeatedly emphasized "the rule that Article III jurisdiction is always an antecedent question" because "[h]ypothetical jurisdiction produces nothing more than a hypothetical judgment." *Steel Co.*, 523 U.S. at 101; *see also, e.g.*,

*FW/PBS*, 493 U.S. at 231.  This rule is binding not only on the district court but also on this one:

> [E]very federal appellate court has a special obligation to satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review, even though the parties are prepared to concede it.  And if the record discloses that the lower court was without jurisdiction this court will notice the defect, although the parties make no contention concerning it.  When the lower federal court lacks jurisdiction, we have jurisdiction on appeal, not of the merits but merely for the purpose of correcting the error of the lower court in entertaining the suit.

*Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986) (quotations and alterations omitted); *accord Steel Co.*, 523 U.S. at 95; *Arizonans for Official English v. Arizona*, 520 U.S. 43, 73 (1997).  And as we've explained above, some of Plaintiffs' claims have obvious standing problems.  *See supra* Part III.B.

On the other hand, Plaintiffs might have standing to bring some of their challenges.  For example, Count Four in the Amended Complaint challenges the State's administrative inspection procedures under the Fourth Amendment.  *See* Am. Compl. ¶¶ 190–91.  And in stark contrast to the allegations regarding other claims, Plaintiffs make some specific allegations that they have been subjected to those procedures and injured by them.  *See id.* ¶¶ 120–52.  The State does not contest Plaintiffs' standing to mount that challenge.[10]  Therefore, the State has not shown the district court is completely without jurisdiction such that the writ should issue "almost as a matter of course."  *In re Hot-Hed Inc.*, 477 F.3d 320, 323 (5th Cir. 2007) (per curiam);

---

[10] Of course, the State's failure to contest standing does not mean there is standing. *See, e.g.*, *Bender*, 475 U.S. at 541; *MidCap Media Fin., L.L.C. v. Pathway Data, Inc.*, 929 F.3d 310, 313 (5th Cir. 2019) ("Notwithstanding the parties' agreement, we have an independent obligation to assess our own jurisdiction before exercising the judicial power of the United States.").  Because we are denying the petition, we need not decide whether Plaintiffs have shown standing to bring Count Four, nor do we need to assess the merits of that claim.

*accord In re Reyes*, 814 F.2d 168, 170 (5th Cir. 1987); *United States v. Denson*, 603 F.2d 1143, 1145 (5th Cir. 1979) (en banc).  We therefore elect, in our discretion, to allow the district court to consider the State's jurisdictional challenges in the first instance.  We think that's particularly prudent because Plaintiffs' scores of legal challenges must be disentangled so standing can be adjudicated for each one.

B.

We also think it prudent not to issue the writ at this time because much of the State's petition challenges the *merits* of Plaintiffs' "cumulative-effects challenge."  The Plaintiffs' theory, as we understand it, is that Louisiana's various laws and regulations regarding abortion cumulate to an undue burden.  But before any federal court can analyze the "cumulative effects" of Louisiana's laws, we must know which laws Plaintiffs have standing to challenge.  Again, jurisdiction first.

A stylized example makes this plain.  If Plaintiffs cannot plausibly allege that they were injured by Legal Requirement *A*, they don't have standing to challenge *A*.  *See supra* Part III.B.2.  So Plaintiffs' cumulative-effects challenge would no longer be: $A + B + C + D$ = an undue burden.  Instead, it would be: $B + C + D$ = an undue burden.[11]

Moreover, it is unclear from the record why the district court did not certify its cumulative-effects order for interlocutory appeal under 28 U.S.C.

---

[11] And, of course, that's still distinct from the following challenge:  Legal Requirement *B* = an undue burden in light of related requirements *E* and *F*.  In assessing whether an individual provision is an undue burden, we consider the relevant "factual context in which the law operates." *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 (5th Cir. 2014).  For example, a court could consider the absence of a state law prohibiting hospitals from discriminating against abortion providers in granting admitting privileges when assessing the burden of a *related* admitting-privileges requirement.  *Ibid.*  But that tells us nothing about whether *unrelated* requirements—regarding, say, admitting privileges and sanitary bathrooms—impose an undue burden.  Nor does it tell us whether such a claim is cognizable.

§ 1292(b).   In its first § 1292(b) order, the district court certified the case because "Plaintiffs present a difficult issue of first impression . . . ."  May 15, 2018 Order, Doc. 76 at 3.  And it noted the cumulative-effects issue lacked "the benefit of clarification from the [Fifth Circuit]." *Ibid.*  Then, in a later § 1292(b) order, the district court said the exact opposite:  "[T]he Court finds that this is not a case of first impression."  March 29, 2019 Order, Doc. 103 at 20.  The district court did not acknowledge its change of heart in that order, much less explain the basis for it.  Nor did it mention our intervening decision in *June Medical Services*, even though Louisiana brought it to the court's attention. *See* Mot. to Dismiss Reply Br., Doc. 100 at 1.

Whatever the merits of Plaintiffs' "cumulative-effects challenge," they are unprecedented.  The Supreme Court has not blessed such a claim.  To the contrary, the Court has analyzed abortion provisions separately rather than cumulatively. *See, e.g.*, *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 879–901 (1992) (evaluating the definition of "medical emergency," the informed-consent requirement, the spousal-notification requirement, the parental-consent provision, and recordkeeping and reporting requirements separately); *Webster v. Reproductive Health Servs.*, 492 U.S. 490, 505–20 (1989) (evaluating four sections of the challenged law individually).  And the Court's consistent focus on individual legal requirements isn't an accident.  For example, in *Ohio v. Akron Ctr. for Reproductive Health*, 497 U.S. 502 (1990), the majority analyzed a constructive-authorization provision, a bypass procedure, and pleading requirements separately. *Id.* at 515–17.  The Court did so over the explicit complaints from dissenting justices who thought they should be considered cumulatively. *Id.* at 527 (Blackmun, J., dissenting) ("The majority considers each provision in a piecemeal fashion, never acknowledging

or assessing the 'degree of burden that the entire regime of abortion regulations places' on the minor.").

Our Court also considered a cumulative-effects argument in *June Medical Services*. In that case, the district court considered a challenge to Louisiana's admitting-privileges requirement ("Act 620"). *See June Med. Servs. L.L.C. v. Kliebert*, 250 F. Supp. 3d 27 (M.D. La. 2017). It analyzed not only the burdens caused by Act 620 but also the burdens caused by unrelated laws—such as a 24-hour notification and waiting period—to conclude Act 620 was unconstitutional. *See id.* at 88 ("The result of these burdens on women and providers, *taken together* and in context, is that many women seeking a safe, legal abortion in Louisiana will be unable to obtain one." (emphasis added)); *id.* at 40, 54–55, 82 (discussing other provisions and their impact on a woman's right to seek an abortion). And the district court based this cumulative-effects approach on its interpretation of *Whole Woman's Health*. *See June Med. Servs.*, 250 F. Supp. 3d at 35. We reversed. *See June Med. Servs.*, 905 F.3d at 791. We specifically criticized the district court's consideration of "unrelated" abortion laws in analyzing the burdens caused by Act 620: "[O]ther abortion regulations are unrelated to admitting privileges and therefore have no bearing on the constitutionality of Act 620." *Id.* at 810 n.60 (citing *Whole Woman's Health*, 136 S. Ct. at 2300).

It is possible the district court nonetheless thought *Whole Woman's Health* serves as precedent for "cumulative-effects challenges." *See* May 29, 2019 Order, Doc. 103 at 12–15. But in suggesting that, the district court relied on the *severability* analysis in *Whole Woman's Health*. Severability obviously governs the remedy after the finding of a constitutional violation; it plays no part in finding a constitutional violation. The *Whole Woman's Health* majority found (in relevant part) one constitutional violation: a single sentence in the

No. 19-30353

Texas Health and Safety Code required abortion clinics to meet the standards for ambulatory surgical centers. *See* 136 S. Ct. at 2300 (citing TEX. HEALTH & SAFETY CODE § 245.010(a)); *id.* at 2314 (describing § 245.010(a) as a single challenged requirement). Then, having found that violation, it held "[t]he statute was meant to require abortion facilities to meet the integrated surgical-center standards—not some subset thereof," and thus declined "to proceed in piecemeal fashion" and choose what "minimum standards" for ambulatory surgical centers should apply to abortion facilities. *Id.* at 2319–20. The Court thus refused "to devise a judicial remedy that . . . entail[s] quintessentially legislative work." *Id.* at 2319 (quotation omitted). Regardless of whether Plaintiffs' "cumulative-effects challenges" are cognizable, *Whole Woman's Health* is not a precedent for them.[12]

Because it is unclear why the district court changed its mind between its orders under § 1292(b), and because it is unclear what relevance *Whole Woman's Health* played in the district court's decision, we think it prudent not to issue the writ at this time. If the district court chooses to certify its decision for interlocutory appeal, some or all of the State's arguments could be resolved without the need for mandamus.

---

[12] Indeed, the *Whole Woman's Health* Court conducted the familiar undue-burden analysis and analyzed the two challenged laws *separately*. *See* 136 S. Ct. at 2300 (concluding "neither of these provisions confers medical benefits sufficient to justify the burdens upon access that *each* imposes" and that "*each* constitutes an undue burden on abortion access" (emphasis added)); *id.* at 2310 (analyzing whether the admitting-privileges requirement imposed an undue burden); *id.* at 2318 (assessing whether the surgical-center requirement "poses a substantial obstacle to women seeking abortions, and constitutes an 'undue burden' on their constitutional right to do so").

No. 19-30353

\* \* \*

The petition for mandamus is DENIED WITHOUT PREJUDICE.

This panel will retain jurisdiction over the decision whether to grant any application for permission to appeal, should the district court grant certification pursuant to 28 U.S.C. § 1292(b), or any subsequent petition for writ of mandamus, should the district court deny certification or fail to resolve the State's jurisdictional challenges. *See In re Trump*, --- F. App'x ---, No. 19-5196, 2019 WL 3285234, at \*1–2 (D.C. Cir. July 19, 2019) (per curiam).