# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

April 7, 2020

Lyle W. Cayce
Clerk

—————

No. 20-50264

—————

In re:  GREG ABBOTT, in his official capacity as Governor of Texas; KEN PAXTON, in his official capacity as Attorney General of Texas; PHIL WILSON, in his official capacity as Acting Executive Commissioner of the Texas Health and Human Services Commission; STEPHEN BRINT CARLTON, in his official capacity as Executive Director of the Texas Medical Board; KATHERINE A. THOMAS, in her official capacity as the Executive Director of the Texas Board of Nursing,

        Petitioners

—————————

Petition for a Writ of Mandamus to
the United States District Court
for the Western District of Texas

—————————

Before DENNIS, ELROD, and DUNCAN, Circuit Judges.

STUART KYLE DUNCAN, Circuit Judge:

To preserve critical medical resources during the escalating COVID-19 pandemic, on March 22, 2020, the Governor of Texas issued executive order GA-09, which postpones non-essential surgeries and procedures until 11:59 p.m. on April 21, 2020. Reading GA-09 as an "outright ban" on pre-viability abortions, on March 30 the district court issued a temporary restraining order ("TRO") against GA-09 as applied to abortion procedures. At the request of Texas officials, we temporarily stayed the TRO while considering their petition for a writ of mandamus directing vacatur of the TRO. We now grant the writ.

No. 20-50264

The "drastic and extraordinary" remedy of mandamus is warranted for several reasons. *In re JPMorgan Chase & Co.*, 916 F.3d 494, 499 (5th Cir. 2019) (citation omitted).

First, the district court ignored the framework governing emergency public health measures like GA-09. *See Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905). "[U]nder the pressure of great dangers," constitutional rights may be reasonably restricted "as the safety of the general public may demand." *Id.* at 29. That settled rule allows the state to restrict, for example, one's right to peaceably assemble, to publicly worship, to travel, and even to leave one's home. The right to abortion is no exception. *See Roe v. Wade*, 410 U.S. 113, 154 (1973) (citing *Jacobson*); *Planned Parenthood v. Casey*, 505 U.S. 833, 857 (1992) (same); *Gonzales v. Carhart*, 550 U.S. 124, 163 (2007) (same).[1]

Second, the district court's result was patently wrong. Instead of applying *Jacobson*, the court wrongly declared GA-09 an "outright ban" on pre-viability abortions and exempted all abortion procedures from its scope. The court also failed to apply *Casey*'s undue-burden analysis and thus failed to balance GA-09's temporary burdens on abortion against its benefits in thwarting a public health crisis.

Third, the district court usurped the state's authority to craft emergency health measures. Instead, the court substituted its own view of the efficacy of applying GA-09 to abortion. But "[i]t is no part of the function of a court" to

---

[1] Our dissenting colleague suggests our decision "follows not because of the law or facts, but because of the subject matter of this case." Dissent at 3. That is wrong. As explained below, *infra* III.A.1, *Jacobson* governs a state's emergency restriction of *any* individual right, not only the right to abortion. The same analysis would apply, for example, to an emergency restriction on gathering in large groups for public worship during an epidemic. *See Prince v. Massachusetts*, 321 U.S. 158, 166–67 (1944) ("The right to practice religion freely does not include liberty to expose the community . . . to communicable disease.").

No. 20-50264

decide which measures are "likely to be the most effective for the protection of the public against disease." *Jacobson*, 197 U.S. at 30.

In sum, given the extraordinary nature of these errors, the escalating spread of COVID-19, and the state's critical interest in protecting the public health, we find the requirements for issuing the writ satisfied. *See Cheney v. U.S. Dist. Court for Dist. of Columbia*, 542 U.S. 367, 380–81 (2004).

We emphasize the limits of our decision, which is based only on the record before us. The district court has scheduled a telephonic preliminary injunction hearing for April 13, 2020, when all parties will presumably have the chance to present evidence on the validity of applying GA-09 in specific circumstances. The district court can then make targeted findings, based on competent evidence, about the effects of GA-09 on abortion access. Our overriding consideration here, however, is that those proceedings adhere to the controlling standards, established by the Supreme Court over a century ago, for adjudging the validity of emergency measures like the one before us.

Accordingly, we grant a writ of mandamus directing the district court to vacate its TRO of March 30, 2020.

I.

As all are painfully aware, our nation faces a public health emergency caused by the exponential spread of COVID-19, the respiratory disease caused by the novel coronavirus SARS-CoV-2. As of April 6, 2020, over 330,000 cases have been confirmed across the United States, with over 8,900 dead.[2] The virus is "spreading very easily and sustainably"[3] throughout the country, with cases

---

[2] Centers for Disease Control and Prevention, Coronavirus Disease 2019 (COVID-19): Cases in the U.S., https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited April 6, 2020).

[3] Centers for Disease Control and Prevention, Coronavirus Disease 2019 (COVID-19): How COVID-19 Spreads, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited April 6, 2020).

No. 20-50264

confirmed in all fifty states, the District of Columbia, and several territories.[4] Over the past two weeks, confirmed cases in the United States have increased by over 2,000%.[5] Federal projections estimate that, even with mitigation efforts, between 100,000 and 240,000 people in the United States could die.[6] In Texas, the virus has spread rapidly over the past two weeks and is predicted to continue spreading exponentially in the coming days and weeks.

On March 13, 2020, the President declared a national state of emergency, and the Governor of Texas declared a state of disaster.[7] Six days later, the Texas Health and Human Services Executive Commissioner declared a public health disaster because the virus "poses a high risk of death to a large number of people and creates a substantial risk of public exposure because of the disease's method of transmission and evidence that there is community spread in Texas."[8] As the district court in this case acknowledged, "Texas faces it[s] worst public health emergency in over a century."

The surge of COVID-19 cases causes mounting strains on healthcare systems, including critical shortages of doctors, nurses, hospital beds, medical

---

[4] Centers for Disease Control and Prevention, Coronavirus Disease 2019 (COVID-19): Cases in the U.S., https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited April 6, 2020).

[5] *Id.* On March 19, 2020, the CDC reports that there were 15,219 diagnosed cases in the United States, excluding cases among persons repatriated to the United States from China and Japan. *Id.* By April 6, 2020, the number of cases reported has risen to 330,891. *Id.*

[6] Rick Noack, et al., *White House task force projects 100,000 to 240,000 deaths in U.S., even with mitigation efforts*, WASHINGTON POST (Mar. 31, 2020), https://www.washingtonpost.com/world/2020/03/31/coronavirus-latest-news/.

[7] *See* Proc. No. 9994, 85 Fed. Reg. 15,337, 2020 WL 1272563 (Mar. 13, 2020); Tex. Proc. of Mar. 13, 2020, https://gov.texas.gov/uploads/files/press/DISASTER_covid19_disaster_proclamation_IMAGE_03-13-2020.pdf.

[8] Tex. Proc. of Mar. 19, 2020, https://gov.texas.gov/uploads/files/press/DECLARATION_of_public_health_disaster_Dr_Hellerstedt_03-19-2020.pdf.

equipment, and personal protective equipment ("PPE").[9] The executive order at issue here, GA-09, responds to this crisis. Issued by the Governor of Texas on March 22, 2020, GA-09 applies to all licensed healthcare professionals and facilities in Texas and requires that they:

> postpone all surgeries and procedures that are not immediately medically necessary to correct a serious medical condition of, or to preserve the life of, a patient who without immediate performance of the surgery or procedure would be at risk for serious adverse medical consequences or death, as determined by the patient's physician.[10]

Importantly, the order "shall not apply to any procedure that, if performed in accordance with the commonly accepted standard of clinical practice, would not deplete the hospital capacity or the personal protective equipment needed to cope with the COVID-19 disaster."[11] Failure to comply with the order may result in administrative or criminal penalties, including "a fine not to exceed $1,000, confinement in jail for a term not to exceed 180 days, or both."[12] The order automatically expires after 11:59 p.m. on April 21, 2020, but can be modified, amended, or superseded.

---

[9] Centers for Disease Control and Prevention, Coronavirus Disease 2019 (COVID-19): Strategies for Optimizing the Supply of Facemasks, https://www.cdc.gov/coronavirus/2019-ncov/hcp/ppe-strategy/face-masks.html (last visited April 6, 2020); Megan L. Ranney, M.D., M.P.H., et al., *Critical Supply Sources—The Need for Ventilators and Personal Protective Equipment during the COVID-19 Pandemic*, NEW ENG. J. OF MED. (Mar. 25, 2020), https://www.nejm.org/doi/full/10.1056/NEJMp2006141?query=featured_coronavirus.

[10] Tex. Exec. Order No. GA-09 (Mar. 22, 2020), https://gov.texas.gov/uploads/files/press/EO-GA_09_COVID-19_hospital_capacity_IMAGE_03-22-2020.pdf.

[11] Tex. Exec. Order No. GA-09 (Mar. 22, 2020), https://gov.texas.gov/uploads/files/press/EO-GA_09_COVID-19_hospital_capacity_IMAGE_03-22-2020.pdf.

[12] Tex. Exec. Order No. GA-09 (Mar. 22, 2020), https://gov.texas.gov/uploads/files/press/EO-GA_09_COVID-19_hospital_capacity_IMAGE_03-22-2020.pdf (citing Tex. Gov't Code § 418.173); *see also* 25 Tex. Admin. Code § 139.32(b)(6); 25 Tex. Admin. Code § 135.24(a)(1)(F); 22 Tex. Admin. Code § 185.17(11); 22 Tex. Admin. Code § 185.57(c) (Mar. 23, 2020); Tex. Occ. Code § 164.051(a)(2); Tex. Occ. Code § 164.051(a)(6); Tex. Occ. Code § 301.452(b)(3); Tex. Occ. Code § 301.452(b)(10).

No. 20-50264

On March 25, 2020, various Texas abortion providers[13] ("Respondents") filed suit in federal district court against multiple Texas officials, including the Governor, Attorney General, three state health officials, and nine District Attorneys ("Petitioners"[14]). Respondents brought substantive due process and equal protection claims and sought to enjoin enforcement of GA-09, as well as the Texas Medical Board's Emergency Rule implementing the order. *See* 22 Tex. Admin. Code § 187.57(c) (Mar. 23, 2020). Simultaneously, Respondents sought a temporary restraining order ("TRO") or a preliminary injunction, based only on their due process claim. Following a March 26 conference call, the district court gave Petitioners until March 30 at 9:00 a.m. to respond, which they did. Later that same day, the district court entered a TRO.

In the TRO, the district court agreed that "Texas faces it[s] worst public health emergency in over a century," and also that "[GA-09], as written, does not exceed the governor's power to deal with the emergency." Nonetheless, the court interpreted GA-09 as "effectively banning all abortions before viability." The court reasoned that, because "no interest" can justify such an "outright ban" on pre-viability abortions, GA-09 contravenes Supreme Court and Fifth Circuit precedent. The TRO therefore prohibits all defendants, including

---

[13] Plaintiffs are Texas abortion providers Planned Parenthood Center for Choice, Planned Parenthood of Greater Texas Surgical Health Services, Planned Parenthood South Texas Surgical Center, Whole Woman's Health, Whole Woman's Health Alliance, Southwestern Women's Surgery Center, Brookside Women's Medical Center PA d/b/a Brookside Women's Health Center and Austin Women's Health Center, and Robin Wallace, M.D. Plaintiffs purport to sue on behalf of themselves, their staff, physicians, nurses, and patients.

[14] Petitioners here do not include the defendant District Attorneys.

6

No. 20-50264

Petitioners, from enforcing GA-09 and the emergency rule "as applied to medication abortions and procedural[15] abortions." App. 267–68, 270.[16]

On the evening of March 30, 2020, Petitioners filed a petition for writ of mandamus in our court, requesting that we direct the district court to vacate the TRO. Petitioners simultaneously sought an emergency stay of the TRO, as well as a temporary administrative stay, while the court considered their request. On March 31, 2020, we temporarily stayed the TRO and set an expedited briefing schedule.

## II.

Federal courts "may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). That includes the writ of mandamus sought by Petitioners. *See Cheney*, 542 U.S. at 380; *In re Gee*, 941 F.3d 153, 157 (5th Cir. 2019). Mandamus is proper only in "exceptional circumstances amounting to a judicial usurpation of power or a clear abuse of discretion." *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 309 (5th Cir. 2008) (en banc) (quoting *Cheney*, 542 U.S. at 380). Before prescribing this strong medicine, "we ask (1) whether the

---

[15] "Procedural" abortions, the term used by Respondents and the district court, refers to what are also called "surgical" abortions. *See*, *e.g.*, *Stenberg v. Carhart*, 530 U.S. 914, 924 (2000) (citing M. Paul et al., A Clinician's Guide to Medical and Surgical Abortion (1999)); *Gonzales v. Carhart*, 550 U.S. 124, 175 (2007) (Ginsburg, J., dissenting) (referring to "surgical abortions") (quoting *Carhart v. Ashcroft*, 331 F.Supp.2d 805, 1011 (D. Neb. 2004), *aff'd*, 413 F.3d 791 (8th Cir. 2005)); *Planned Parenthood v. Casey*, 505 U.S. 833, 969 (1992) (Rehnquist, J., concurring in the judgment in part and dissenting in part) (referring to "any other surgical procedure except abortion") (quoting *Webster v. Reproductive Health Servs.*, 492 U.S. 490, 517 (1989) (plurality opinion)); *see also*, *e.g.*, Br. for Petitioners at 33 n.64, *Planned Parenthood v. Casey*, 505 U.S. 833 (1992) (Nos. 91-744, 91-902), 1992 WL 12006398 (referring to "induced abortion" as a "surgical procedure[ ]").

[16] The TRO is scheduled to expire at 3:00 p.m. on April 13, 2020. The district court has scheduled a telephonic hearing on Plaintiffs' request for a preliminary injunction for 9:30 a.m. that same day. App. 271. Our references to "App." throughout this opinion are to the appendix to the mandamus petition. *See* ECF 3 (5th Cir. No. 20-50264).

No. 20-50264

petitioner has demonstrated that it has no other adequate means to attain the relief it desires; (2) whether the petitioner's right to issuance of the writ is clear and indisputable; and (3) whether we, in the exercise of our discretion, are satisfied that the writ is appropriate under the circumstances." *In re Itron, Inc.*, 883 F.3d 553, 567 (5th Cir. 2018) (quoting *Cheney*, 542 U.S. at 380–81) (cleaned up). "These hurdles, however demanding, are not insuperable. They simply reserve the writ for really extraordinary causes." *Gee*, 941 F.3d at 158 (cleaned up). In such a case, mandamus provides a "useful 'safety valve[]' for promptly correcting serious errors." *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 111 (2009) (quoting *Digital Equipment Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 883 (1994)).

### III.

Petitioners claim they satisfy all three mandamus prongs and are therefore entitled to the writ. As to the first prong, they argue mandamus is proper for obtaining relief, even from a non-appealable TRO, when the stakes are "extraordinarily time-sensitive." ECF 2 at 30–31. As to the second prong, Petitioners contend the district court "clearly and indisputably erred" by ruling that abortion is an absolute right which cannot be curtailed even in the midst of a public health emergency.[17] *Id.* at 11–24. Finally, as to the third prong,

---

[17] Alternatively under prong two, Petitioners assert that (1) no justiciable controversy exists as to the Governor and Attorney General because they lack authority to enforce GA-09, and (2) Respondents lack third-party standing to sue on behalf of their patients. We decline to grant relief on these grounds. First, quite apart from the Governor and Attorney General, a justiciable controversy exists as to the Petitioner health officials, who may enforce the order's administrative penalties. *See*, *e.g.*, 22 Tex. Admin. Code § 187.57(b). On remand, however, the district court should consider whether the Eleventh Amendment requires dismissal of the Governor or Attorney General because they lack any "connection" to enforcing GA-09 under *Ex parte Young*, 209 U.S. 123 (1908). *City of Austin v. Paxton*, 943 F.3d 993, 999 (5th Cir. 2019); *see also Morris v. Livingston*, 739 F.3d 740, 745–46 (5th Cir. 2014). Second, Respondents have standing to sue on their own behalf because GA-09 "directly operates" against them. *Planned Parenthood of Cen. Mo. v. Danforth*, 428 U.S. 52, 62 (1976) (cleaned up). We therefore need not consider at this time whether Respondents may sue on

No. 20-50264

Petitioners argue mandamus is proper because "[t]he longer [Respondents] are allowed to perform elective procedures—consuming scarce PPE, increasing hospitalizations, and potentially spreading the virus to countless individuals—the longer it will take to flatten the curve in Texas, meaning more illnesses, more hospitalizations, and more deaths." *Id.* at 31. We address each prong in turn, beginning with the second.

## A.

We first address the second mandamus prong—whether entitlement to the writ is "clear and indisputable"—because it is central to our analysis. *See*, *e.g.*, *Volkswagen*, 545 F.3d at 311 (beginning with second prong because it "captures the essence of the disputed issue"). "In recognition of the extraordinary nature of the writ, we require more than showing that the court misinterpreted the law, misapplied it to the facts, or otherwise engaged in an abuse of discretion." *In re Lloyd's Register N. Am., Inc.*, 780 F.3d 283, 290 (5th Cir. 2015). Rather, a petitioner has a clear and indisputable right to the writ only when there has been a "usurpation of judicial power" or "a clear abuse of discretion that produces patently erroneous results." *JPMorgan Chase*, 916 F.3d at 500 (cleaned up); *see also Gee*, 941 F.3d at 159; *Lloyd's Register*, 780 F.3d at 290. Usurpation of judicial power occurs when courts act beyond their jurisdiction or fail to act when they have a duty to do so. *Will v. United States*, 389 U.S. 90, 95 (1967). But it also occurs in other situations. The Supreme Court has sanctioned use of the writ "to restrain a lower court when its actions would threaten the separation of powers by 'embarrassing the executive arm of the Government,' or result in the 'intrusion by the federal judiciary on a delicate area of federal-state relations.'" *Cheney*, 542 U.S. at 381 (citing *Will*,

---

behalf of their patients. We note that the Supreme Court recently granted a certiorari petition raising this third-party standing issue. *See Russo v. June Med. Servs.*, No. 18-1460.

No. 20-50264

389 U.S. at 95; *Ex parte Peru,* 318 U.S. 578, 588 (1943); *Maryland v. Soper (No. 1),* 270 U.S. 9 (1926)) (cleaned up).

We conclude Petitioners have shown "a clear and indisputable right to issuance of the writ." *Volkswagen*, 545 F.3d at 311. In issuing the TRO, the district court clearly abused its discretion by failing to apply (or even acknowledge) the framework governing emergency exercises of state authority during a public health crisis, established over 100 years ago in *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905). This extraordinary error allowed the district court to create a blanket exception for a common medical procedure—abortion—that falls squarely within Texas's generally-applicable emergency measure issued in response to the COVID-19 pandemic. This was a patently erroneous result. In addition, the court usurped the power of the governing state authority when it passed judgment on the wisdom and efficacy of that emergency measure, something squarely foreclosed by *Jacobson*.[18]

1.

In *Jacobson*, the Supreme Court considered a claim that the state's compulsory vaccination law—enacted amidst a growing smallpox epidemic in Cambridge, Massachusetts—violated the defendant's Fourteenth Amendment right "to care for his own body and health in such way as to him seems best."

---

[18] This case differs from *Preterm-Cleveland v. Atty. Gen. of Ohio*, No. 20-3365, 2020 WL 1673310 (6th Cir. Apr. 6, 2020), which declined to review a TRO against Ohio's non-essential-surgeries order. Ohio appealed on the basis that the TRO "threaten[ed] to inflict irretrievable harms." *Id.* at *1. Observing the TRO was "narrowly tailored" and did not permit "blanket" provision of abortions, the majority concluded that the TRO would not inflict irreparable harms and thus that it lacked jurisdiction over the appeal. *Id.* at *1–2. By contrast, here Petitioners seek not appeal but mandamus, a drastic remedy that we nonetheless find appropriate. Moreover, the TRO here is not "narrowly tailored" but exempts all abortions from GA-09. The TRO's broad sweep also distinguishes this case from recent district court decisions in Alabama and Oklahoma. *See Robinson v. Marshall*, No. 2:19cv365-MHT, 2020 WL 1659700 (M.D. Ala. Apr. 3, 2020); *South Wind Women's Center v. Stitt*, No. CIV-20-277-G, 2020 WL 1677094 (W.D. Okla. Apr. 6, 2020).

*Id.* at 26. The Court rejected this claim. Famously, it explained that the "liberty secured by the Constitution . . . does not import an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint." *Id.* Rather, "a community has the right to protect itself against an epidemic of disease which threatens the safety of its members." *Id.* at 27. In describing a state's police power to combat an epidemic, the Court explained:

> [I]n every well-ordered society charged with the duty of conserving the safety of its members the rights of the individual in respect of his liberty may at times, under the pressure of great dangers, be subjected to such restraint, to be enforced by reasonable regulations, as the safety of the general public may demand.

*Id.* at 29.

The Supreme Court has repeatedly acknowledged this principle. *See, e.g.*, *Lawton v. Steele*, 152 U.S. 133, 136 (1894) (recognizing that "the state may interfere wherever the public interests demand it" and "discretion is necessarily vested in the legislature to determine, not only what the interests of the public require, but what measures are necessary for the protection of such interests"); *Compagnie Francaise de Navigation a Vapeur v. La. State Bd. of Health*, 186 U.S. 380, 393 (1902) (upholding Louisiana's right to quarantine passengers aboard vessel—even where all were healthy—against a Fourteenth Amendment challenge); *Prince v. Massachusetts*, 321 U.S. 158, 166–67 (1944) (noting that "[t]he right to practice religion freely does not include liberty to expose the community . . . to communicable disease"); *United States v. Caltex*, 344 U.S. 149, 154 (1952) (acknowledging that "in times of imminent peril— such as when fire threatened a whole community—the sovereign could, with immunity, destroy the property of a few that the property of many and the lives of many more could be saved").

To be sure, individual rights secured by the Constitution do not disappear during a public health crisis, but the Court plainly stated that rights

could be reasonably restricted during those times. *Jacobson*, 197 U.S. at 29. Importantly, the Court narrowly described the scope of judicial authority to review rights-claims under these circumstances: review is "only" available

> if a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has *no real or substantial relation to those objects*, or is, *beyond all question, a plain, palpable invasion of rights secured by the fundamental law.*

*Id.* at 31 (emphasis added). Elsewhere, the Court similarly described this review as asking whether power had been exercised in an "arbitrary, unreasonable manner," *id.* at 28, or through "arbitrary and oppressive" regulations, *id.* at 38. *Accord Lawton*, 152 U.S. at 137 ("To justify the state in thus interposing its [police power] in behalf of the public, it must appear [1] that the interests of the public generally . . . require such interference; and [2] that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals.").

*Jacobson* did emphasize, however, that even an emergency mandate must include a medical exception for "[e]xtreme cases." 197 U.S. at 38. Thus, the vaccination mandate could not have applied to an adult where vaccination would exacerbate a "particular condition of his health or body." *Id.* at 38–39. In such a case, the judiciary would be "competent to interfere and protect the health and life of the individual concerned." *Id.* at 39. At the same time, *Jacobson* disclaimed any judicial power to second-guess the state's policy choices in crafting emergency public health measures: "Smallpox being prevalent and increasing at Cambridge, the court would *usurp the functions of another branch of government* if it adjudged, as matter of law, that the mode adopted under the sanction of the state, to protect the people at large was arbitrary, and not justified by the necessities of the case." *Jacobson*, 197 U.S. at 28 (emphasis added); *see also id.* at 30 ("It is no part of the function of a court or a jury to determine which one of two modes was likely to be the most

effective for the protection of the public against disease. That was for the legislative department to determine in the light of all the information it had or could obtain.").

The bottom line is this: when faced with a society-threatening epidemic, a state may implement emergency measures that curtail constitutional rights so long as the measures have at least some "real or substantial relation" to the public health crisis and are not "beyond all question, a plain, palpable invasion of rights secured by the fundamental law." *Id.* at 31. Courts may ask whether the state's emergency measures lack basic exceptions for "extreme cases," and whether the measures are pretextual—that is, arbitrary or oppressive. *Id.* at 38. At the same time, however, courts may not second-guess the wisdom or efficacy of the measures. *Id.* at 28, 30.

*Jacobson* remains good law. *See, e.g.*, *Kansas v. Hendricks*, 521 U.S. 346, 356–57 (1997) (recognizing Fourteenth Amendment liberties may be restrained even in civil contexts, relying on *Jacobson*); *Hickox v. Christie*, 205 F. Supp. 3d 579 (D.N.J. 2016) (rejecting, based on *Jacobson*, a § 1983 lawsuit concerning 80-hour quarantine of nurse returning from treating Ebola patients in Sierra Leone). And, most importantly for the present case, nothing in the Supreme Court's abortion cases suggests that abortion rights are somehow exempt from the *Jacobson* framework. Quite the contrary, the Court has consistently cited *Jacobson* in its abortion decisions.

In *Roe v. Wade*, the Supreme Court announced for the first time that an expectant mother has a constitutional right to an abortion. 410 U.S. 113. Nineteen years later, in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, the Court reaffirmed this right and established the current standard for abortion restrictions. 505 U.S. 833. *Casey* recognized that after a fetus is viable, states may ban abortion outright, except for pregnancies that endanger the mother's life or health. *Id.* at 846 (plurality opinion). After *Casey*, there remain

two constitutional restrictions on states' ability to regulate abortion. First, states "may not prohibit any woman from making the ultimate decision to terminate" a pre-viability pregnancy. *Gonzales v. Carhart*, 550 U.S. 124, 146 (2007) (quoting *Casey*, 505 U.S. at 879 (plurality opinion)). In other words, states may not impose outright bans on pre-viability abortions. *See Jackson Women's Health Org. v. Dobbs* [*Jackson II*], 945 F.3d 265, 273 (5th Cir. 2019). Second, states "may not impose" on the right "an undue burden, which exists if a regulation's 'purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability.'" *Id.* (quoting *Casey*, 505 U.S. at 878 (plurality opinion)); *see also Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2309 (2016) (explaining "[t]he rule announced in *Casey* . . . requires that courts consider the burdens a law imposes of abortion access together with the benefits those laws confer").

None of these cases, so far as we are aware, involved a state's postponement of some abortion procedures in response to a public health crisis—the context in which *Jacobson* plainly applies. But three of the Court's principal abortion cases—*Roe*, *Casey*, and *Carhart*—cite *Jacobson* with approval and without suggesting that abortion rights are somehow exempt from its framework. In *Roe*, the Supreme Court cited *Jacobson* as one example of the Court's refusal to recognize an "unlimited right to do with one's body as one pleases." 410 U.S. at 154 (citing *Jacobson*, 197 U.S. 11). The Court reasoned that the right to abortion "is not unqualified and must be considered against important state interests in regulation." *Id.* Similarly, in *Casey*, the plurality cited *Jacobson* as one example of the Court's balance between "personal autonomy and bodily integrity" on one hand and "governmental power to mandate medical treatment or to bar its rejection" on the other. 505 U.S. at 857 (citing *Jacobson*, 197 U.S. at 24–30). Finally, in the course of upholding a federal restriction on certain abortion methods in *Carhart*, the

Court cited *Jacobson* to show it had "given state and federal legislatures wide discretion to pass legislation in areas where there is medical and scientific uncertainty." 550 U.S. at 163 (citing *Jacobson*, 197 U.S. at 30–31).

By all accounts, then, the effect on abortion arising from a state's emergency response to a public health crisis must be analyzed under the standards in *Jacobson*. Respondents all but concede this point, offering no discernible argument that *Jacobson* has been superseded or is otherwise inapplicable during a public health crisis such as the COVID-19 pandemic. *See* ECF 53 at 16. The district court, however, failed to recognize *Jacobson*'s long-established framework. While acknowledging that "Texas faces it[s] worst public health emergency in over a century," the court treated that fact as entirely irrelevant. Indeed, the court explicitly refused to consider how the Supreme Court's abortion cases apply to generally-applicable emergency health measures, saying it would "not speculate on whether the Supreme Court included a silent 'except-in-a-national-emergency clause' in its previous writings on the issue." App. 268.

That analysis is backwards: *Jacobson* instructs that *all* constitutional rights may be reasonably restricted to combat a public health emergency. We could avoid applying *Jacobson* here only if the Supreme Court had specifically exempted abortion rights from its general rule. It has never done so. To the contrary, the Court has repeatedly cited *Jacobson* in abortion cases without once suggesting that abortion is the only right exempt from limitation during a public health emergency. In sum, by refusing even to consider *Jacobson*—the controlling Supreme Court precedent that squarely governs judicial review of rights-challenges to emergency public health measures—the district court "clearly and indisputably erred." *JPMorgan Chase*, 916 F.3d at 500 (quoting *In re Occidental Petroleum Corp.*, 217 F.3d 293, 295 (5th Cir. 2000)) (emphasis omitted). Under our precedents, that alone is enough to satisfy the second

mandamus prong. *See Itron*, 883 F.3d at 568 (petitioners had a "clear and indisputable right to the writ" because failure to apply the proper legal standard was "obvious" error); *see also In re Ford Motor Co.*, 591 F.3d 406, 415 (5th Cir. 2009) (granting writ where "[i]t was patently erroneous for the [district] court to ignore . . . binding precedent").

2.

Moreover, the district court's refusal to acknowledge or apply *Jacobson*'s legal framework produced a "patently erroneous" result. *JPMorgan Chase*, 916 F.3d at 500 (quoting *Lloyd's Register*, 780 F.3d at 290). Under *Jacobson*, the district court was empowered to decide only whether GA-09 lacks a "real or substantial relation" to the public health crisis or whether it is "beyond all question, a plain, palpable invasion" of the right to abortion. 197 U.S. at 31. On the record before us, the answer to both questions is no, but the district court did not even ask them. Instead, the court bluntly declared GA-09 an "outright ban" on pre-viability abortions and exempted all abortion procedures, in whatever circumstances, from the scope of this emergency public health measure. That was a patently erroneous result.[19]

a.

The first *Jacobson* inquiry asks whether GA-09 lacks a "real or substantial relation" to the crisis Texas faces. *Id.* The answer is obvious: the district court itself conceded that GA-09 is a valid emergency response to the COVID-19 pandemic. The court recognized, as does everyone involved, that

---

[19] Although not necessary to our decision, we note that the district court purported to enjoin GA-09 as to *all* abortion providers in Texas. But Respondents are only a subset of Texas abortion providers and did not sue as class representatives. The district court lacked authority to enjoin enforcement of GA-09 as to anyone other than the named plaintiffs. *See Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975) (explaining "neither declaratory nor injunctive relief can directly interfere with enforcement of contested statutes or ordinances except with respect to the particular federal plaintiffs"). The district court should be mindful of this limitation on federal jurisdiction at the preliminary injunction stage.

No. 20-50264

Texas faces a public health crisis of unprecedented magnitude and that GA-09 "does not exceed the governor's power to deal with the emergency." App. 268. Our own review of the record easily confirms that conclusion. GA-09 is supported by findings that (1) "a shortage of hospital capacity or personal protective equipment would hinder efforts to cope with the COVID-19 disaster," and (2) "hospital capacity and personal protective equipment are being depleted by surgeries and procedures that are not medically necessary to correct a serious medical condition or to preserve the life of a patient." App. 34. The order also references, and reinforces, the Governor's prior executive order, GA-08, "aimed at slowing the spread of COVID-19." *Id.*[20] Accordingly, GA-09 instructs licensed health care professionals and facilities to postpone non-essential surgeries and procedures until 11:59 p.m. on April 21, 2020. App. 35. For their part, Respondents appear to concede the validity of GA-09 as a general matter: they recognize that Texas faces an "unprecedented public health crisis" and that "[g]overnment officials and medical professionals expect a surge of infections that will test the limits of a health care system already facing a shortage of PPE." ECF 53 at 3.

To be sure, GA-09 is a drastic measure, but that aligns it with the numerous drastic measures Petitioners and other states have been forced to take in response to the coronavirus pandemic. Faced with exponential growth of COVID-19 cases, states have closed schools, sealed off nursing homes, banned social gatherings, quarantined travelers, prohibited churches from holding public worship services, and locked down entire cities. These measures would be constitutionally intolerable in ordinary times, but are recognized as

---

[20] Tex. Exec. Order No. GA-08 (Mar. 19, 2020), https://gov.texas.gov/uploads/files/press/EO-GA_08_COVID-19_preparedness_and_mitigation_FINAL _03-19-2020_1.pdf. The dissent is therefore mistaken that GA-09 "was not adopted to serve th[e] interest" in preventing the spread of COVID-19. Dissent at 12.

appropriate and even necessary responses to the present crisis. So, too, GA-09. As the state's infectious disease expert points out, "[g]iven the risk of transmission in health care settings" there is "a sound basis for limiting all surgeries except those that are immediately medically necessary so as to prevent the spread of COVID 19." App. 242. In sum, it cannot be maintained on the record before us that GA-09 bears "no real or substantial relation" to the state's goal of protecting public health in the face of the COVID-19 pandemic. *Jacobson*, 197 U.S. at 31.

b.

The second *Jacobson* inquiry asks whether GA-09 is "*beyond question*, in palpable conflict with the Constitution." *Id.* (emphasis added). The district court, while not framing the question in those terms, evidently thought the answer was yes. But the court reached that conclusion only by grossly misreading GA-09 as an "outright ban" on all pre-viability abortions. Properly understood, GA-09 merely postpones certain non-essential abortions, an emergency measure that does not plainly violate *Casey* in the context of an escalating public health crisis. As we explain below, however, Respondents will have the opportunity to show at the upcoming preliminary injunction hearing that certain applications of GA-09 *may* constitute an undue burden under *Casey*, if they prove that, "beyond question," GA-09's burdens outweigh its benefits in those situations. *See Hellerstedt*, 136 S. Ct. at 2309.

To begin with, the district court's central (and only) premise—that GA-09 is an "outright ban" on all pre-viability abortions—is plainly wrong. The court reasoned that GA-09 was by definition invalid in light of our decisions in *Jackson II* and *Jackson III*, which recognize states cannot ban pre-viability abortions. App. 267–68. But GA-09 only delays certain non-essential abortions. GA-09 thus differs from the regulations in *Jackson II* and *III* in three key respects. First, GA-09 expires on April 21, 2020, three weeks after its effective

date. Tex. Gov't Code Ann. § 418.012. Second, GA-09 includes an emergency exception for the mother's life and health, based on the determination of the administering physician. App. 30; App. 35. Third, GA-09 contains a separate exception for "any procedure" that, if performed under normal clinical standards, "would not deplete the hospital capacity or the personal protective equipment needed to cope with the COVID-19 disaster." App. 35. These characteristics, which the district court failed to mention,[21] place GA-09 in stark contrast with the restrictions in *Jackson II* and *III*.

*Jackson II* invalidated Mississippi's ban on abortions after fifteen weeks, with narrow exceptions for "medical emergenc[ies]" and "severe fetal abnormalit[ies]." 945 F.3d at 269 (citations omitted). The state "conceded that it had identified no medical evidence that a fetus would be viable at 15 weeks." *Id.* at 270. We invalidated the law as "a prohibition on pre-viability abortion." *Id.* at 272–73. Mississippi also enacted Senate Bill 2116, which criminalized abortion "after a 'fetal heartbeat has been detected,'" *Jackson Women's Health Org. v. Dobbs [Jackson III]*, 951 F.3d 246, 248 (5th Cir. 2020) (citation omitted), something that "can occur anywhere between six and twelve weeks." *Id.* The only exceptions were for "death of, or serious risk of 'substantial and irreversible' bodily injury to" the mother. *Id.* (citation omitted). We invalidated the law in a one-page per curiam opinion relying principally on *Jackson II*. *Id.*

Mississippi's now-invalid laws are quite different from GA-09. First, both were permanent, whereas GA-09 expires in just a few weeks.[22] The expiration

---

[21] The district court's only allusion to the scope of GA-09 was its statement that the order "either bans all *non-emergency* abortions in Texas or bans all *non-emergency* abortions in Texas starting at 10 weeks of pregnancy." App. 267–68 (emphasis added). But the district court did not mention GA-09's expiration date, nor cite, quote, or discuss GA-09's exceptions.

[22] Respondents imply that GA-09 is effectively indefinite in duration. For example, they claim that "[f]or many women, the denial of access to abortion will be permanent . . . given the uncertain duration of the emergency." But the district court did not temporarily restrain some indefinite regulation; it restrained GA-09, which by all accounts expires on

date makes GA-09 a delay, not a ban, and also shows GA-09 is reasonably tailored to the present crisis. "The Supreme Court has repeatedly upheld a wide variety of abortion regulations that entail some delay in the abortion but that serve permissible Government purposes," even those—such as parental consent laws—that "in practice can occasion real-world delays of several weeks." *Garza v. Hargan*, 874 F.3d 735, 755 (D.C. Cir. 2017) (en banc) (mem.) (Kavanaugh, J., dissenting). Second, Mississippi's laws contained narrower medical exceptions than GA-09. The fifteen-week ban exempted only "medical emergenc[ies]" and "severe fetal abnormalit[ies]." *Jackson II*, 945 F.3d at 269. The fetal-heartbeat law exempted only abortions that would prevent the mother's death or "substantial and irreversible" bodily injury. *Jackson III*, 951 F.3d at 248. GA-09, by contrast, contains a broader exception: it allows procedures that are "immediately medically necessary to correct a serious medical condition of, or to preserve the life of, a patient who without immediate performance of the surgery or procedure would be at risk for serious adverse medical consequences or death." App. 35. It also separately exempts procedures that, if performed under accepted clinical standards, would not deplete needed medical resources. *Id.*

GA-09 also vests far more discretion in physicians to determine whether the life-or-health exception is met. The fifteen-week ban in *Jackson II* required a "good faith clinical judgment" of a medical emergency, Miss. Code Ann. § 41-41-191(3)(j), and the physician's "reasonable medical judgment" of a qualifying fetal abnormality, *id.* § 41-41-191(3)(h). The fetal-heartbeat law required the physician to "declare in writing, under penalty of perjury," that the abortion

---

April 21, 2020. App. 35. If anything, Respondents' concern about the indefinite duration "of the emergency" serves to strengthen Petitioners' position that "extraordinary measures" must be taken now to mitigate the "'exponential increase' in COVID-19 cases . . . expected over the next few days and weeks." ECF 2 at 6.

met the exception, *id.* § 41-41-34.1(2)(b)(ii). Here, GA-09 merely states that the health exception attaches "as determined by the patient's physician." App. 35. There are no statutory requirements confining the physician's judgment, and the physician need not report his determination to the state.

Properly understood, then, GA-09 is a temporary postponement of all non-essential medical procedures, including abortion, subject to facially broad exceptions. Because that does not constitute anything like an "outright ban" on pre-viability abortion, GA-09 "cannot be affirmed to be, *beyond question*, in palpable conflict with the Constitution." *Jacobson*, 197 U.S. at 31 (emphasis added). As already discussed, the Supreme Court's abortion cases have repeatedly cited *Jacobson* to demarcate the limits states may place on abortion. *See Roe*, 410 U.S. at 154; *Casey*, 505 U.S. at 857; *Carhart*, 550 U.S. at 163. GA-09 is, without question, one such limit. The order is a concededly valid public health measure that applies to "all surgeries and procedures," App. 35, does not single out abortion, and merely has the effect of delaying certain non-essential abortions. Moreover, the order has an exemption for serious medical conditions, comporting with *Jacobson*'s requirement that health measures "protect the health and life" of susceptible individuals. *Jacobson*, 197 U.S. at 39. Indeed, the exemption in GA-09 goes well beyond the exceptions for "[e]xtreme cases" *Jacobson* discussed. *Id.* In sum, *Jacobson* offers no basis for the district court's conclusion that abortion rights merit an across-the-board exemption from an measure like GA-09. To find otherwise "would practically strip the [executive] department of its function to care for the public health and the public safety when endangered by epidemics of disease." *Id.* at 37.

Moreover, due to its mistaken view that GA-09 "bans" pre-viability abortions, the district court failed to analyze GA-09 under *Casey*'s undue-burden test. App. 268. This was error. Under *Casey*, courts must ask whether an abortion restriction is "undue," which requires "consider[ing] the burdens a

law imposes on abortion access together with the benefits those laws confer." *Hellerstedt*, 136 S. Ct. at 2310, 2309–10 (discussing *Casey*, 505 U.S. at 887–98). The district court was required to do this analysis—that is, it should have asked whether GA-09 imposes burdens on abortion that "beyond question" exceed its benefits in combating the epidemic Texas now faces. *Jacobson*, 197 U.S. at 31. But that analysis would have required careful parsing of the evidence. *See Hellerstedt*, 136 S. Ct. at 2310 (*Casey* "place[s] considerable weight upon evidence . . . presented in judicial proceedings"). Any consideration of the evidence, however, is entirely absent from the district court's order.

For example, the district court did not consider whether different methods of abortion may consume PPE differently. Our own review of the record, at this preliminary stage, reveals considerable evidence that surgical abortions consume PPE.[23] By contrast, the record is unclear how PPE is consumed in medication abortions.[24] Nor did the district court consider

---

[23] For instance, Respondents' complaint states that clinicians use "gloves, a surgical mask, and protective eyewear" for surgical abortions. *See* Complaint at ¶ 54 (App. 17). Their declarations similarly attest that surgical abortions consume sterile and non-sterile gloves, masks, gowns, and shoe covers. *See* Southwestern Declaration ¶ 19, App. 86; Fort Worth and McAllen Declaration ¶ 10, App. 91–92; PPGTSHS Declaration, ¶ 12, App. 117; Austin Women's Declaration ¶ 11, App. 110. Second-trimester abortions require more extensive PPE, including face shields. *See, e.g.,* Southwestern Declaration ¶ 19, App. 86; Austin Women's Declaration ¶ 11, App. 110. After a surgical abortion, a provider examines the fetal tissue in a pathology laboratory, which requires a gown, face shield or goggles, shoe covers, and gloves. *See* Fort Worth and McAllen Declaration ¶ 12, App. 092; WWHA Austin Declaration ¶ 15, App. 100.

[24] Respondents assert PPE is not used in "providing the pills" for medication abortions, ECF 53 at 31, whereas Petitioners counter that, for medication abortions, Texas requires a physical examination, ultrasound, and follow-up visits—all of which consume PPE. ECF 67 at 7–8; ECF 2 at 17–18. *See also* Tex. Health & Safety Code § 171.063(c) (requiring physician to examine pregnant woman before prescribing "an abortion-inducing drug"); Tex. Health & Safety Code § 171.012(a)(4) (requiring patient receive ultrasound during initial examination); Tex. Health & Safety Code § 171.063(e)–(f) (requiring follow-up appointment to ensure abortion complete); 25 Tex. Admin. Code 139.53(b)(4) (same). Petitioners also point out that some number of medication abortions result in incomplete abortions that require

whether Respondents could prove that GA-09 infringes abortion rights in specific contexts. For example, in their stay opposition, Respondents argue that GA-09 cannot apply to "patients whose pregnancies will, before the expiration of the stay, reach or exceed twenty-two weeks LMP ["last menstrual period"], the gestational point at which abortion may no longer be provided in Texas." ECF 30 at 21 (brackets added). As Petitioners point out, if competent evidence shows that a woman is in that position, nothing prevents her from seeking as-applied relief. ECF 2 at 22 n.28.

We do not decide at this stage, however, whether an injunction narrowly tailored to particular circumstances would pass muster under the *Jacobson* framework. *See*, *e.g.*, *ODonnell v. Harris Cty.*, 892 F.3d 147, 163 (5th Cir. 2018) ("A district court abuses its discretion if it does not narrowly tailor an injunction to remedy the specific action which gives rise to the order." (citation and internal quotations omitted)). These are issues that the parties may pursue at the preliminary injunction stage, where Respondents will bear the burden to prove, "by a clear showing," that they are entitled to relief. *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11A Wright, Miller, & Kane, Fed. Prac. & Proc. § 2948 (2nd ed. 1995)); *cf. Ayotte v. Planned Parenthood*, 546 U.S. 320, 331 (2006) (injunction should be tailored to "[o]nly [the] few applications" of challenged statute that "would present a constitutional problem"). Our overarching point here is that the district court did not even apply *Casey*'s undue-burden test and thus failed to weigh GA-09's

---

hospitalization. ECF 2 at 18; ECF 67 at 7–8; *see also* American College of Obstetricians and Gynecologists, Clinical Guidelines: Medical management of first-trimester abortion, 89 Contraception 148, 149 (2014), https://www.contraceptionjournal.org/article/S0010-7824(14)00026-2/pdf (estimating "efficacy" of medication abortions using mifepristone). The dissent appears to accept at face value Respondents' representations about how medication abortions consume PPE. *See* Dissent at 11. We think that evidentiary determination is better left to the district court at the preliminary injunction stage.

No. 20-50264

benefits and burdens in any particular circumstance. The district court therefore lacked any basis for declaring that GA-09 constitutes an across-the-board violation of *Casey*.

In sum, based on this record we conclude that GA-09—an emergency measure that postpones certain non-essential abortions during an epidemic— does not "beyond question" violate the constitutional right to abortion. *Jacobson*, 197 U.S. at 31.

3.

Finally, the district court's extraordinary failure to evaluate GA-09 under the *Jacobson* framework also usurped the state's authority to craft measures responsive to a public health emergency. Such judicial encroachment intrudes on the duties of the "executive arm of Government" and "on a delicate area of federal-state relations," further bolstering Texas's right to issuance of the writ. *Cheney*, 542 U.S. at 381.

In addressing the fourth and final TRO factor—whether a TRO would disserve the public interest—the district court did little more than assert its own view of the effectiveness of GA-09. The district court did not provide any explanation of its conclusion that the public health benefits from an emergency measure like GA-09 are "outweighed" by any temporary loss of constitutional rights. Instead, the court rotely concluded that all injunctions vindicating constitutional rights serve the public interest and that a TRO would "continue the *status quo*." App. 270. With respect, that blinks reality. The *status quo* Texas faces, along with the rest of the nation, is a public health crisis that is making once-in-a-lifetime demands on citizens, government, industry, and the medical profession. Where there is a *status quo* to preserve, it is certainly true that an injunction does "not disserve the public interest [if] it will prevent constitutional deprivations." *Jackson Women's Health Org. v. Currier [Jackson I]*, 760 F.3d 448, 458 n.9 (5th Cir. 2014). But the essence of equity is the ability

24

to craft a particular injunction meeting the exigencies of a particular situation. "Flexibility rather than rigidity has distinguished it." *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944). Thus, a court must at the very least weigh the potential injury to the public health when it considers enjoining state officers from enforcing emergency public health laws. A single conclusory statement that does not explain this balancing falls far short.

Instead of doing any of this, the district court substituted its *ipse dixit* for the Governor's reasoned judgment, bluntly concluding that "[t]he benefits of a limited potential reduction in the use of some personal protective equipment by abortion providers is outweighed by the harm of eliminating abortion access in the midst of a pandemic that increases the risks of continuing an unwanted pregnancy." App. 270. Respondents—as well as our dissenting colleague—share this view. ECF 53 at 2, 17–21; Dissent at 11–12.

As *Jacobson* repeatedly instructs, however, if the choice is between two reasonable responses to a public crisis, the judgment must be left to the governing state authorities. "It is no part of the function of a court or a jury to determine which one of two modes [i]s likely to be the most effective for the protection of the public against disease." *Jacobson*, 197 U.S. at 30. Such authority properly belongs to the legislative and executive branches of the governing authority. In light of the massive and rapidly-escalating threat posed by the COVID-19 pandemic, "the court would *usurp the functions of another branch of government* if it adjudged, as matter of law, that the mode adopted under the sanction of the state, to protect the people at large was arbitrary, and not justified by the necessities of the case." *Id.* at 28 (emphasis added). The district court's order contravened this principle; Respondents and the dissenting opinion invite us to do the same. We decline to engage in such "unwarranted judicial action." *Will*, 389 U.S. at 95.

To be sure, the judiciary is not completely sidelined in a public health crisis. We have already explained that Respondents may seek more targeted relief, if they can prove their entitlement to it, at the preliminary injunction stage. Additionally, a court may inquire whether Texas has exploited the present crisis as a pretext to target abortion providers *sub silentio. See Lawton*, 152 U.S. at 137. Respondents make allegations to that effect, contending that Petitioners are using GA-09 "to exploit the COVID-19 pandemic to achieve their longtime goal of banning abortion in Texas." ECF 53 at 1. Nonetheless, on this record, we see no evidence that GA-09 was meant to exploit the pandemic in order to ban abortion or was crafted "as some kind of ruse to unreasonably delay . . . abortion[s] past the point where a safe abortion could occur." *Garza*, 874 F.3d at 753 n.3 (Kavanaugh, J., dissenting). To the contrary, GA-09 applies to a whole host of medical procedures and regulates abortions evenhandedly with those other procedures. The order itself does not even mention abortion—or any other particular procedure—at all. Instead, it refers broadly to "all surgeries or procedures" that meet its criteria.[25] Respondents point to no evidence that GA-09 applies any differently to abortions than to any other procedure. Nor do they cite any comparable procedures that are exempt from GA-09's requirements. On the other hand, Petitioners produce evidence that myriad other procedures are affected just as abortions are. For example, Petitioners offer a declaration from Dr. Timothy Harstad, M.D., who testified that some cosmetic, bariatric, orthopedic, and gynecologic procedures

---

[25] The district court relied heavily on the Attorney General's press release of March 23, 2020, which clarified that in the Attorney General's view, the GA-09 "includ[es] abortion providers." App. 31, 264–65. But the district court gave no reason to believe this press release has the force of law. And, in any event, the press release also reads the order to apply "to all surgeries and procedures[,] . . . including routine dermatological, ophthalmological, and dental procedures, as well as . . . orthopedic surgeries or any type of abortion that is not medically necessary to preserve the life or health of the mother." App. 30.

"are being suspended" alongside abortions. App. 230–31. Petitioners also point to the fact that the Centers for Medicare & Medicaid Services have recommended postponing several other critical procedures, including endoscopies and colonoscopies, and even some oncological and cardiovascular procedures for low-risk patients.[26] This evidence undermines Respondents' contention that GA-09 exploits the present crisis to ban abortion. Respondents will have the opportunity, of course, to present additional evidence in conjunction with the district court's preliminary injunction hearing scheduled for April 13, 2020. Our decision, however, must be limited to the record before us. Based on that record, we cannot say that GA-09 is a pretext for targeting abortion.

The district court, for its part, did not even purport to engage in the sort of limited pretext inquiry contemplated by cases like *Jacobson* and *Lawton*. Instead, the district court overstepped its proper role and imposed its own judgment about how the COVID-19 pandemic should be handled with respect to abortion.[27] This was a usurpation of the state's power. *Will*, 389 U.S. at 95.

---

[26] *See* CMS Adult Elective Surgery and Procedures Recommendations, https://www.cms.gov/files/document/31820-cms-adult-elective-surgery-and-procedures-recommendations.pdf (last visited April 6, 2020).

[27] Likewise, the dissent contends that "[r]estricting contact between abortion providers and their patients cannot further the goals of GA-09 if the same order permits in-person contact between providers and patients in other settings." Dissent at 13. But this is true of all surgeries and procedures. Nonetheless, in part to "limit[ ] exposure of patients and staff to the virus that causes COVID-19," CMS recommends postponing "non-essential surgeries and other procedures." *See* CMS Adult Elective Surgery and Procedures Reccomendations (Mar. 15, 2020), https://www.cms.gov/files/document/31820-cms-adult-elective-surgery-and-procedures-recommendations.pdf. GA-09 notes that it follows recommendations from "the President's Coronavirus Task Force, the CDC, the U.S. Surgeon General, and the Centers for Medicare and Medicaid Services." And the state's infectious disease expert said that the risk of spreading the virus is real, "especially in the health care setting due to the proximity." Marier Declaration ¶ 6, App. 240. We reiterate that *Jacobson* commands that it is not the court's role "to determine which one of two modes [i]s likely to be most effective for the protection of the public against disease." 197 U.S. at 30.

No. 20-50264

\*\*\*

In sum, based on the record before us, we conclude that Petitioners have a clear and indisputable right to issuance of the writ, satisfying the second mandamus prong. *Itron*, 883 F.3d at 567.

B.

We now consider whether Petitioners have shown they "have no other adequate means" to obtain the relief they seek. *Cheney*, 542 U.S. at 380. This requirement is "designed to ensure that the writ will not be used as a substitute for the regular appeals process." *Id.* at 380–81. Mandamus is generally unavailable for review of "district court decisions that, while not immediately appealable, can be reviewed at some juncture." *In re Crystal Power Co.*, 641 F.3d 82, 83 (5th Cir. 2011). "[F]or an appeal to be an inadequate remedy, there must be 'some obstacle to relief beyond litigation costs that renders obtaining relief not just expensive but effectively unobtainable.'" *Depuy Orthopaedics*, 870 F.3d at 353 (quoting *Lloyd's Register*, 780 F.3d at 289). In other words, the error claimed must be "truly irremediable on ordinary appeal." *JPMorgan Chase*, 916 F.3d at 499 (cleaned up) (quoting *Depuy*, 870 F.3d at 352–53).

Given the surging tide of COVID-19 cases and deaths, Petitioners have made this showing. In mill-run cases, it might be a sufficient remedy to simply wait until the expiration of the TRO, and then appeal an adverse preliminary injunction. *See* 28 U.S.C. § 1292(a)(1). In other cases, a surety bond may ensure that a party wrongfully enjoined can be compensated for any injury caused. *See* Fed. R. Civ. P. 65(c).

Those methods would be woefully inadequate here. The TRO is set to expire April 13, 2020, two weeks from the date it issued. App. 271. But time is of the essence when it comes to preventing the spread of COVID-19 and conserving medical resources critically needed to care for patients. To illustrate the speed at which the pandemic has been unfolding: As of March 20 there

28

were, per the WHO's daily report, 234,073 confirmed cases of COVID-19 and 9,840 deaths.[28] As of April 6, there were 1,210,956 confirmed cases, and 67,954 deaths.[29] As of April 1, Texas had 4,544 cases; by April 6, the number had risen to 7,359 cases.[30] That number will undoubtedly rise substantially in coming days absent successful preventative measures. As the Dallas Morning News wrote on April 1: "The greatest number of cases will come in about a 10-day period that will begin soon."[31] On April 2, Respondents conceded that "[g]overnment officials and medical professionals expect a surge of infections that will test the limits of a health care system already facing a shortage of PPE[.]" ECF 53 at 3. Respondents also concede that surgical abortions consume PPE, such as "gloves, a surgical mask, disposable protective eyewear, disposable or washable gowns, and . . . shoe covers." *Id.* at 6. Moreover, abortion is a common procedure: the evidence shows 53,843 total abortions—36,793 of those surgical—were performed in Texas in 2017. App. 222. In sum, were Petitioners required to wait and appeal an adverse preliminary injunction, the harms from a broad suspension of GA-09 for all abortion procedures could not "be put back in the bottle." *Volkswagen*, 545 F.3d at 319.

---

[28] WORLD HEALTH ORGANIZATION, CORONAVIRUS DISEASE 2019 (COVID-19) SITUATION REPORT – 60 (March 20, 2020), https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200320-sitrep-60-covid-19.pdf?sfvrsn=d2bb4f1f_2.

[29] WORLD HEALTH ORGANIZATION, CORONAVIRUS DISEASE 2019 (COVID-19) SITUATION REPORT – 77 (April 6, 2020), https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200406-sitrep-77-covid-19.pdf?sfvrsn=21d1e632_2.

[30] Johns Hopkins University & Medicine Coronavirus Resource Center, Coronavirus COVID-10 Global Cases, https://coronavirus.jhu.edu/map.html (last visited April 6, 2020).

[31] Steven Gjerstad, *U.S. cases of COVID-19 will peak in a couple of weeks; Only social distancing will break the virus*, DALLAS MORNING NEWS (April 1, 2020), https://www.dallasnews.com/opinion/commentary/2020/04/01/us-cases-of-covid-19-will-peak-in-a-couple-of-weeks-only-social-distancing-will-break-the-virus/

No. 20-50264

The error would be "truly irremediable" through ordinary appeal. *JPMorgan Chase*, 916 F.3d at 499 (cleaned up).[32]

We therefore conclude no other adequate means exist for Petitioners to obtain the relief they seek, thus satisfying the first mandamus prong.

C.

Finally, we must decide whether to exercise our discretion to issue the writ. *See Gee*, 941 F.3d at 170. "Discretion is involved in defining both the circumstances that justify exercise of writ power and also the reasons that may justify denial of a writ even though the circumstances might justify a grant." 16 WRIGHT & MILLER, *supra*, § 3933. "The longstanding view is that discretion to issue the writs should be exercised only in special cases . . . ." *Id.*

We are persuaded that this petition presents an extraordinary case justifying issuance of the writ. First, as we have noted, the current global pandemic has caused a serious, widespread, rapidly-escalating public health crisis in Texas. Petitioners' interest in protecting public health during such a time is at its zenith. In the unprecedented circumstances now facing our society, even a minor delay in fully implementing the state's emergency measures could have major ramifications because, as the evidence shows, an

---

[32] Federal courts of appeals have issued writs of mandamus to vacate TROs in a number of less-urgent scenarios. *See, e.g.*, *In re King World Prods., Inc.*, 898 F.2d 56 (6th Cir. 1990) (vacating TRO enjoining news organization from broadcasting video recording); *Truck Drivers Local Union No. 807, Int'l Bhd. of Teamsters v. Bohack Corp.*, 541 F.2d 312 (2d Cir. 1976) (vacating TRO enjoining Board from conducting unfair labor practice proceedings); *O'Neill v. Battisti*, 472 F.2d 789 (6th Cir. 1972) (vacating TRO enjoining Ohio Supreme Court from enforcing its own disciplinary order or taking further disciplinary action against state judge). *A fortiori*, mandamus is an appropriate mechanism for challenging the TRO in the present case, which restrains Petitioners from fully implementing emergency public health measures in a time of unprecedented crisis.

"exponential increase in COVID-19 cases is expected over the next few days and weeks." App. 224–25. It is hard to imagine a more urgent situation.

Second, the district court's refusal to acknowledge the governing framework from *Jacobson* was a clear abuse of discretion that produced a patently erroneous result: bestowing on abortion providers a blanket exemption from a generally-applicable emergency public health measure. Not stopping there, the district court usurped the power of state authorities by passing judgment on the wisdom and efficacy of those emergency measures. These are "extraordinary" errors. *See Volkswagen*, 545 F.3d at 318.

Third, "writs of mandamus are supervisory in nature and are particularly appropriate when the issues also have an importance beyond the immediate case." *Id.* at 319. While unclear how long the current crisis will last, it is probable that other legal disputes will arise pitting claims of private rights against the states' authority to preserve public health and safety. Indeed, 34 states plus the District of Columbia have filed amicus briefs in this case, demonstrating the widespread importance of the issues involved. We also view the "sheer magnitude" of the district court's error and its effect on the state's ongoing emergency efforts to slow COVID-19 as evidence that the "safety valve" of mandamus is appropriate. *Itron*, 883 F.3d at 568–69 (cleaned up).

Lastly, we note that this case is distinguishable from our recent decisions in *Gee* and *JPMorgan Chase*, where, in our discretion, we declined to issue writs of mandamus. In *Gee*, we concluded that, even though the district court clearly abused its discretion in failing to undertake the required jurisdictional analysis, mandamus was nevertheless not required because (1) it was unclear what result the district court would reach once it performed the correct analysis, and (2) many of the petitioner's arguments went beyond jurisdiction and challenged the plaintiffs' theory on the merits. *See* 941 F.3d at 170. In light of those considerations, we deemed it imprudent to issue the writ. *Id.* In

31

*JPMorgan Chase*, we concluded that the district court's error, while significant, was not "clear and indisputable" because it "followed numerous others" who had made the same mistake. 916 F.3d at 504.

We confront vastly different circumstances here. To begin with, unlike in *Gee*, the district court addressed the merits of Respondents' claim, though it did so in a manner that overlooked the controlling framework and produced patently erroneous results. *See Volkswagen*, 545 F.3d at 319. Given the severe time constraints here, we do not have the luxury to wait and see what approach the district court might take on the merits. Second, unlike in *JPMorgan Chase*, the district court's decision here did not align with "numerous" other courts which had confronted the same issue. To the contrary, the district court cited not a single case addressing restrictions on abortion during a public health crisis. Therefore, "we are aware of nothing that would render the exercise of our discretion to issue the writ inappropriate." *Volkswagen*, 545 F.3d at 319.

For those reasons, we exercise our discretion to issue a writ of mandamus. *See Cheney*, 542 U.S. at 381.

IV.

The petition for writ of mandamus is GRANTED, directing the district court to vacate the TRO entered on March 30, 2020. Petitioners' emergency motion to stay the TRO pending resolution of their mandamus petition is DENIED AS MOOT. Our temporary stay of March 31, 2020, is LIFTED. Any future appeals or mandamus petitions in this case will be directed to this panel and will be expedited. *Gee*, 941 F.3d at 173; *In re First South Sav. Ass'n*, 820 F.2d 700, 716 (5th Cir. 1987). The mandate shall issue forthwith.

No. 20-50264

JAMES L. DENNIS, dissenting.

Eight days ago, the district court temporarily restrained Texas's temporary ban of all medication abortions and procedural abortions. "The benefits of a limited potential reduction in the use of some personal protective equipment by abortion providers," the district court explained, "is outweighed by the harm of eliminating abortion access in the midst of a pandemic that increases the risks of continuing an unwanted pregnancy, as well as the risks of travelling to other states in search of time-sensitive medical care." Other states, including Oklahoma,[1] Alabama,[2] and Ohio,[3] have attempted to limit a woman's access to abortion during the COVID-19 pandemic. Thus far, none of those attempts has been successful in the face of a constitutional challenge, either in the district courts or on appeal. *South Wind Women's Center LLC v. Stitt*, No. CIV-20-277-G, 2020 WL 1677094, at *2 (W.D. Okla. Apr. 6, 2020) ("[W]hile the current public health emergency allows the state of Oklahoma to impose some of the cited measures *delaying* abortion procedures, it has acted in an 'unreasonable,' 'arbitrary' and 'oppressive' way—and imposed an 'undue

---

[1] Okla. Exec. Order No. 2020-07 (Mar. 24, 2020), https://www.sos.ok.gov/documents/executive/1919.pdf; Press Release, Office of the Oklahoma Governor, Governor Stitt Clarifies Elective Surgeries and Procedures Suspended under Executive Order (Mar. 27, 2020), https://www.governor.ok.gov/articles/press_releases/governor-stitt-clarifies-elective-surgeries ("[A]ny type of abortion services . . . which are not a medical emergency . . . or otherwise necessary to prevent serious health risks to the unborn child's mother are included in that Executive Order.")

[2] Order of the State Health Officer Suspending Certain Public Gatherings Due to Risk of Infection by COVID-19 (Mar. 27, 2020), https://governor.alabama.gov/assets/2020/03/Amended-Statewide-Social-Distancing-SHO-Order-3.27.2020-FINAL.pdf; *Robinson v. Marshall*, No. 2:19CV365-MHT, 2020 WL 1520243, at *1 (M.D. Ala. Mar. 30, 2020) (explaining that the Alabama state's attorney "in his oral representations on the record, took the position that the March 27 order requires the postponement of *any* abortion that is not medically necessary to protect the life or health of the mother").

[3] Ohio Department of Health, RE: Director's Order for the Management of Non-essential Surgeries and Procedures throughout Ohio (Mar. 17, 2020); *Preterm-Cleveland v. Attorney Gen. of Ohio*, No. 1:19-cv-00360, slip op. at 2-3 (S.D. Ohio Mar. 30, 2020) (stating that Ohio's attorney general sent letters to abortion providers citing the Director's Order and they must "immediately stop performing non-essential and elective surgical abortions").

burden' on abortion access—in imposing requirements that effectively *deny* a right of access to abortion.  Further, the court concludes that the benefit to public health of the ban on medication abortions is minor and outweighed by the intrusion on Fourteenth Amendment rights caused by that ban."); *Robinson v. Marshall*, No. 2:19CV365-MHT, 2020 WL 1520243, at \*2 (M.D. Ala. Mar. 30, 2020) ("Because Alabama law imposes time limits on when women can obtain abortions, the March 27 order is likely to fully prevent some women from exercising their right to obtain an abortion.  And for those women who, despite the mandatory postponement, are able to vindicate their right, the required delay may pose an undue burden that is not justified by the State's purported rationales."); *Preterm-Cleveland v. Attorney Gen. of Ohio*, No. 1:19-cv-00360, slip op. at 7 (S.D. Ohio Mar. 30, 2020) ("Defendants have not demonstrated to the Court, at this point, that Plaintiffs' performance of these surgical procedures will result in any beneficial amount of net saving of PPE in Ohio such that the net saving of PPE outweighs the harm of eliminating abortion."), *appeal dismissed*, No. 20-3365 (6th Cir. Apr. 6, 2020). The American College of Obstetricians and Gynecologists released a statement that "abortion should not be categorized" as a "procedure[] that can be delayed during the COVID-19 pandemic."[4]  The statement emphasized, as the district court did, that abortion is "a time-sensitive service for which a delay of several weeks, or in some cases days, may increase the risks or potentially make it completely inaccessible."

Today, the majority concludes that allowing women in Texas access to time-sensitive reproductive healthcare, a right supported by almost 50 years of Supreme Court precedent, was a "patently erroneous" result that must be

---

[4] *Joint Statement on Abortion Access During the COVID-19 Outbreak*, THE AMERICAN COLLEGE OF OBSTETRICS AND GYNECOLOGISTS (Mar. 18, 2020), https://www.acog.org/news/news-releases/2020/03/joint-statement-on-abortion-access-during-the-covid-19-outbreak.

remedied by "one of the most potent weapons in the judicial arsenal." *See In re JPMorgan Chase & Co.*, 916 F.3d 494, 504 (5th Cir. 2019) (quoting *Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 380 (2004). Unfortunately, this is a recurring phenomenon in this Circuit in which a result follows not because of the law or facts, but because of the subject matter of this case. *See June Med. Servs. L.L.C. v. Gee*, 905 F.3d 787, 835 (5th Cir. 2018) ("[W]hen abortion shows up, application of the rules of law grows opaque." (Higginbotham, J., dissenting)), *cert. granted*, 140 S. Ct. 35 (2019)). For the reasons that follow, I dissent.

## I.

On March 22, 2020, Texas Governor Greg Abbott signed Executive Order GA-09 ("GA-09") to expand hospital bed capacity as the state responds to the COVID-19 virus. The Executive Order, which "ha[s] the force and effect of law," TEX. GOV'T CODE ANN. § 418.012 (West 2019), states that until 11:59 p.m. on April 21, 2020,

> [a]ll licensed health care professionals and all licensed health care facilities shall postpone all surgeries and procedures that are not immediately medically necessary to correct a serious medical condition of, or to preserve the life of, a patient who without immediate performance of the surgery or procedure would be at risk for serious adverse medical consequences or death, as determined by the patient's physician.[5]

The Executive Order exempts "any procedure that, if performed in accordance with the commonly accepted standard of clinical practice, would not deplete the hospital capacity or the personal protective equipment needed to cope with the COVID-19 disaster."

---

[5] Tex. Exec. Order No. GA-09 (Mar. 22, 2020), https://gov.texas.gov/uploads/files/press /EO-GA_09_COVID-19_hospital_capacity_IMAGE_03-22-2020.pdf.

No. 20-50264

The day after the Governor signed GA-09, Texas Attorney General Ken Paxton issued a news release stating that GA-09's prohibition on medically unnecessary surgeries and procedures "applies throughout the State and to all surgeries and procedures that are not immediately medically necessary, including . . . any type of abortion that is not medically necessary to preserve the life or health of the mother."[6]  The release states that "[f]ailure to comply with an executive order issued by the governor related to the COVID-19 disaster can result in penalties of up to $1,000 or 180 days of jail time."  Paxton emphasized that "[n]o one is exempt from the governor's executive order on medically unnecessary surgeries and procedures, including abortion providers," and "[t]hose who violate the governor's order will be met with the full force of the law."

Several organizations that provide abortion services in Texas and a board-certified family medicine physician who provides abortion care (collectively, "Respondents") brought an action in the Western District of Texas under 42 U.S.C. § 1983, challenging GA-09 and the Texas Medical Board's emergency amendment to Title 22 Texas Administrative Code section 187.57, which imposes the same requirements.  Respondents moved for a temporary restraining order ("TRO") to enjoin enforcement of GA-09 and the Emergency Rule insofar as they purport to ban all medication abortions and procedural abortions, as the attorney general's news release suggests.

I include this explanation not to reiterate the procedural history the majority has already explained, but to emphasize what exactly we are reviewing.  Respondents brought a constitutional challenge to GA-09, and

---

[6] News Release, Office of the Texas Attorney General, Health Care Professionals and Facilities, Including Abortion Providers, Must Immediately Stop All Medically Unnecessary Surgeries and Procedures to Preserve Resources to Fight COVID-19 Pandemic (Mar. 23, 2020), https://www.texasattorneygeneral.gov/news/releases/health-care-professionals-and-facilities-including-abortion-providers-must-immediately-stop-all.

though the attorney general's interpretation of that order constitutes the crux of the constitutional issues present in this case, it is GA-09 and only GA-09 that we are interpreting.  The majority agrees that the attorney general's news release interpreting GA-09 is not legally binding.  Maj. Op. at 25 n.22.  The attorney general cannot modify the text of the governor's executive order through his news release; only the governor has the power to "issue executive orders . . . [that] have the force and effect of law."  TEX. GOV'T CODE ANN. § 418.012.  And GA-09 grants abortion providers the power to determine whether a procedure is "immediately medically necessary to correct a serious medical condition of . . . a patient who without immediate performance of the surgery or procedure would be at risk for serious adverse medical consequences."  It also permits an exception for any abortion that "if performed in accordance with the commonly accepted standard of clinical practice, would not deplete the hospital capacity or the personal protective equipment needed to cope with the COVID-19 disaster."

The attorney general's news release interprets GA-09 to ban "any type of abortion that is not medically necessary to preserve the life or health of the mother," regardless, apparently, of whether such a procedure (1) in the view of the patient's physician, is immediately medically necessary and would put a patient at risk for serious adverse medical consequences if not performed, or (2) would fall under GA-09's exception for procedures that do not utilize PPE or deplete hospital capacity.

## II.

The district court granted Respondents' TRO, halting enforcement of GA-09 insofar as it bans all procedural and medication abortions.  Petitioners seek a writ of mandamus to remedy what they describe as a "clearly and indisputably erroneous" decision.  The Supreme Court and this court have repeatedly emphasized that mandamus is an "extraordinary remedy" to be

exercised only in "exceptional circumstances." *See Cheney*, 542 U.S. at 380 (quoting *Will v. United States*, 389 U.S. 90, 95 (1967)); *In re Lloyd's Register N. Am., Inc.*, 780 F.3d 283, 288, 294 (5th Cir. 2015); *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 309, 311 (5th Cir. 2008). To obtain relief, Petitioners "must do more than prove merely that the court erred." *In re Occidental Petroleum Corp.*, 217 F.3d 293, 295 (5th Cir. 2000). "The traditional use of the writ . . . has been to confine the court against which mandamus is sought to a lawful exercise of its prescribed jurisdiction." *Cheney*, 542 U.S. at 380 (alteration omitted) (quoting *Roche v. Evaporated Milk Ass'n*, 319 U.S. 21, 26 (1943)). Its use is justified in "only exceptional circumstances amounting to a judicial 'usurpation of power,' or a 'clear abuse of discretion.'" *Id.* (quoting *Will*, 389 U.S. at 95; *Bankers Life & Casualty Co. v. Holland*, 346 U.S. 379, 383 (1953)).

Mandamus relief generally requires that (1) "the party seeking issuance of the writ [must] have no other adequate means to attain the relief he desires—a condition designed to ensure that the writ will not be used as a substitute for the regular appeals process"; (2) "the petitioner must satisfy the burden of showing that [his] right to issuance of the writ is clear and indisputable"; and (3) "the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances." *Id.* at 380-81 (internal quotation marks and citations omitted).

Under the "clear and indisputable" prong, *id.*, Petitioners must show the district court's determination was a "clear abuse[] of discretion that produce[d] patently erroneous results." *In re Lloyd's Register N. Am., Inc.*, 780 F.3d at 290 (quoting *In re Volkswagen of Am., Inc.*, 545 F.3d at 312). Both conditions— clear abuse of discretion and a patently erroneous result—must be met to obtain mandamus relief. *See id.*

The majority concludes that the district court clearly erred by not applying *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905), and

its result, allowing medication and procedural abortions to proceed, was patently erroneous. It also concludes that "the court usurped the power of the governing state authority when it passed judgment on the wisdom and efficacy of those emergency measures, something squarely foreclosed by *Jacobson*." Maj. Op. at 9-10. For several reasons, the majority is wrong.

## III.

In *Jacobson*, the city of Cambridge, Massachusetts, pursuant to state statute, passed a regulation requiring all of its citizens to receive a smallpox vaccination to combat a smallpox outbreak. 197 U.S. at 12. Jacobson challenged the regulation, arguing that it violated his Fourteenth Amendment right "to care for his own body and health in such a way as to him seems best." *Id.* at 26. The Court explained that the state's action in compelling vaccination was an exercise of its police power, which "must be held to embrace, at least, such reasonable regulations established directly by legislative enactment as will protect the public health and the public safety." *Id.* at 25. In rejecting Jacobson's constitutional challenge, the Court explained "[e]ven liberty itself, the greatest of all rights, is not unrestricted license to act according to one's own will. It is only freedom from restraint under conditions essential to the equal enjoyment of the same right by others." *Id.* at 26-27. The Court explained, however, that individual rights are not gutted during a crisis: Courts have a duty to review a state's exercise of their police power where the state's action (1) goes "beyond the necessity of the case, and, under the guise of exerting a police power . . . violate[s] rights secured by the Constitution," (2) "has no real or substantial relation to" "protect[ing] the public health, the public morals, or the public safety," or (3) "is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law." *Id.* at 28, 30. *Jacobson*, then, stands for the proposition that a state by its legislature may utilize its police power to enact laws to protect the public health and safety,

39

even though such laws may impose restraints on citizens' liberties, so long as that regulation is "justified by the necessities of the case" and does not violate rights secured by the Constitution "under the guise of exerting a police power." *Id.* at 28-29.

## A.

This case is clearly distinguishable from *Jacobson*. There, the city required its citizens to get a smallpox vaccine to stop the spread of a smallpox outbreak. The measure adopted by the city related directly to the public health crisis—every citizen who did not receive the vaccine could actively spread the disease, and therefore mandatory vaccination actively curbed the disease's spread. The thread connecting GA-09 to combatting COVID-19 is more attenuated—premised not on the idea that abortion providers are spreading the virus, but that their continuing operation requires the use of resources that should be conserved and made available to healthcare workers fighting the outbreak. This reasoning requires the additional link that those PPE resources denied to abortion providers are indeed conserved, are significant in amount, and can realistically be reallocated to healthcare workers fighting COVID-19, a showing that Petitioners have not made.

## B.

The majority claims that "*Jacobson* disclaimed any judicial power to second-guess the policy choices made by the state in crafting emergency public health measures." Maj. Op. at 12. But the Court did not conclude that an emergency situation deprives courts of their duty and power to uphold the constitution—quite the opposite, in fact.

The Court in *Jacobson* determined that the Massachusetts law should not be invalidated because "[s]mallpox being prevalent and increasing in Cambridge, the court would *usurp the functions of another branch of government* if it adjudged, as a matter of law, that the mode adopted under the

sanction of the state, to protect the people at large was arbitrary, and not justified *by the necessities of the case.*" *Jacobson*, 197 U.S. at 28 (emphases added).   The Court certainly did not disclaim any power to so rule, under appropriate circumstances, however, explaining:

> We say necessities of the case, because it might be that an acknowledged power of a local community to protect itself against an epidemic threatening the safety of all might be exercised in particular circumstances and in reference to particular persons in such an arbitrary, unreasonable manner, or might go so far beyond what was reasonably required for the safety of the public, as to authorize or compel the courts to interfere for the protection of such persons.

*Id.*   The Court in *Jacobson* also explained that it had previously "recognized the right of a state to pass sanitary laws, laws for the protection of life, liberty, [and] health . . . within its limits." *Id.* (citing *Hannibal & St. J.R. Co. v. Husen*, 95 U. S. 465, 471-73 (1877)).   While states have the right to pass such laws, the Court explained, the courts have a "duty to hold . . . invalid" laws that "went beyond the necessity of the case, and, under the guise of exerting a police power, invaded the domain of Federal authority, and violated rights secured by the Constitution." *Id.*

Thus, the Court clearly anticipated that courts would exercise judicial oversight over a state's decision to restrict personal liberties during emergencies. *See id.* *Jacobson* merely acknowledged that what is reasonable during an emergency is different from what is reasonable under normal circumstances, and that courts must not act as super-executives in an emergency.  Given the language of *Jacobson*, then, the Court was concerned with both what the majority focuses on—the state's ability to adequately protect its citizens during a public health crisis—and what the majority ignores—the courts' ability to protect citizens' constitutional rights when

41

states attempt to unjustifiably seize and wield power in the name of the health and safety.

Therefore, *Jacobson* reaffirms the district court's duty, and our duty, "to hold [GA-09] invalid" if it (1) goes "beyond the necessity of the case, and, under the guise of exerting a police power . . . violate[s] rights secured by the Constitution," (2) "has no real or substantial relation to" "protect[ing] the public health, the public morals, or the public safety," or (3) "is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law." *See id.* at 28, 30.

## IV.

After concluding that the district court clearly abused its discretion in not relying on *Jacobson*, the majority determines that this error produced a patently erroneous result. Maj. Op. at 15-23. The majority claims that the district court's conclusion that GA-09 amounts to a previability ban is patently erroneous. Maj. Op. at 17. In my view, this "conclusion" does not accurately characterize the "result" of the district court's order. *See In re Volkswagen of Am., Inc.*, 545 F.3d at 310 ("[W]e only will grant mandamus relief when such errors produce a patently erroneous *result*." (emphasis added)). The result of the district court's order is to uphold women's rights to abortions and to allow medical and procedural abortions to proceed. That result is not patently erroneous and therefore does not warrant mandamus relief. Contrary to the majority's view, nothing in *Jacobson* or any of the Supreme Court's cases requires a different result.

## A.

The goals of GA-09 are furthered by restricting abortions, according to Petitioners, because abortions: (1) "reduce[] the scarce supply of PPE available to healthcare providers treating COVID-19 patients," (2) "result[] in the

hospitalization of women," reducing hospital capacity for COVID-19 patients, and (3) "contribute[] to the spread of the COVID-19 virus."

Though GA-09 does not define PPE, Respondents explain that the term is generally understood to refer to N95 respirators, surgical masks, non-sterile and sterile gloves, and disposable protective eyewear, gowns, and hair and shoe covers.  In response to Petitioners' argument that abortions will deplete PPE necessary for healthcare providers treating COVID-19 patients, Respondents contend that abortions utilize little or no PPE and that abortions are time-sensitive procedures.

Regarding the first point, whether an abortion takes no PPE or some PPE depends on the type of procedure. Procedural abortions in Texas are single-day procedures that, unlike surgeries, require no hospital bed, incision, general anesthesia, or sterile field.  During the procedure, the providers use PPE such as gloves, a surgical mask, disposable protective eyewear, disposable or washable gowns, and hair and shoe covers.  Most Respondents do not have N95 respirators, and those that do have only a small supply that they rarely, if ever, use.  Medication abortions, which involve only taking medications by mouth, require no PPE to administer the medication, and may require the use of gloves only at pre- and post-procedure appointments, depending on the circumstances.     Petitioners     identify     no     other     treatment     through     oral medication that would be affected by GA-09.

Moreover, Respondents point out that Petitioners' PPE conservation argument mistakenly assumes that a patient unable to obtain an abortion will not otherwise need medical care that requires the consumption of PPE. Pregnant patients who cannot access abortion require prenatal care and must often undergo unplanned hospital visits. And to the extent patients are prevented from obtaining abortions altogether, childbirth and delivery require exponentially more PPE than an abortion.  Denying pregnant patients access

to abortion now may simply change the purpose for which the PPE is used, without any surplus that is able to be reallocated to healthcare workers treating COVID-19 patients.  Other pregnant patients with the resources to do so may choose to seek abortions outside of Texas—a result clearly contrary to Texas's purported goal of avoiding the spread of the virus. GA-09 has already led patients to travel to other states to obtain abortion care in a pandemic, exposing patients and third parties to infection risks.   One out-of-state physician stated that he treated 30 abortion patients from Texas in the week after the attorney general's statement.

Petitioners also argue that the abortion restrictions are necessary to preserve hospital capacity, while Respondents point out that legal abortions are safe and almost never require hospitalization, and abortion care is substantially less likely to lead to hospitalization than caring for a patient with respect to full term pregnancy, childbirth, and post-natal care.

Finally, Petitioners argue that GA-09 as understood to ban all abortions provides the benefit of restricting contact between patients, medical staff, and physicians to help prevent the spread of COVID-19.  While this may be true, the language of GA-09 reveals that it was not adopted to serve this interest. GA-09 exempts "any procedure . . . that would not deplete the hospital capacity or the personal protective equipment needed to cope with the COVID-19 disaster."  It excludes all forms of medical care save "surgeries and procedures," and therefore does not contemplate restricting any other type of medical care that results in contact between providers and patients.  Restricting contact between abortion providers and their patients cannot further the goals of GA-09 if the same order permits in-person contact between providers and patients in other settings.

Petitioners suggest that, in addition to these reasons, "Plaintiffs have identified no substantial burdens that will result from delaying elective

abortions in accordance with [GA-09]." The majority agrees, concluding that "the expiration date makes GA-09 a delay, not a ban." Maj. Op. at 19. But it is painfully obvious that a delayed abortion procedure could easily amount to a total denial of that constitutional right: If currently scheduled abortions are postponed, many women will miss the small window of opportunity they have to access a legal abortion. Texas generally prohibits abortion after twenty-two weeks from the first day of the pregnant person's last menstrual period ("LMP"), *see* TEX. HEALTH & SAFETY CODE § 171.044, and therefore GA-09 has the potential to deny a woman's constitutional right to an abortion where that right will lapse during the duration of GA-09. A woman has only a small window of opportunity to exercise her constitutional right to choose, and therefore Petitioners' action in further narrowing that window will present a burden in many cases.

## B.

First, prohibiting abortions for patients whose pregnancies will, before the expiration of GA-09, reach or exceed twenty-two weeks, the gestational point at which abortion may no longer be provided in Texas, represents "a plain, palpable invasion of rights secured by the fundamental law." *Jacobson*, 197 U.S. at 31. Even if such state action is successful in conserving the minimal PPE utilized in such procedures, as applied to this group of people, the state's action constitutes an outright ban on previability abortion, which is "beyond question, in palpable conflict with the Constitution." *Id.*; *id.* at 28 (explaining that a state's police power "might be exercised . . . in reference to particular persons in such an arbitrary, unreasonable manner, or might go so far beyond what was reasonably required for the safety of the public, as to authorize or compel the courts to interfere for the protection of such persons"); *see Roe v. Wade*, 410 U.S. 113, 153-54 (1973). Insofar as GA-09 applies to this group of women, then, the district court's result in allowing abortions to

proceed was not patently erroneous.  *See In re Lloyd's Register N. Am., Inc.*, 780 F.3d at 290.

Second, insofar as GA-09 bans procedural and medication abortions generally, this act "has no real or substantial relation to" Petitioners' stated goal of conserving PPE and maintaining access to hospital beds and therefore it goes "beyond the necessity of the case, and, under the guise of exerting a police power . . . violate[s] rights secured by the Constitution." *See Jacobson*, 197 U.S. at 28, 31.  In particular, abortions require minimal PPE (and medication abortions require no PPE to administer the medication), do not require the use of N95 respirator masks, and rarely require hospitalization. And as Respondents point out, the medical resources conserved by prohibiting abortions would simply be otherwise consumed through prenatal care by women forced to continue their pregnancies or incentivize women to travel out of state to obtain abortions, facilitating the spread of the virus.  Finally, even assuming that delayed abortions in fact conserve PPE, Respondents have not demonstrated how the PPE could realistically be reallocated to healthcare workers fighting COVID-19.

Petitioners have, therefore, failed to establish that the district court "reached a patently erroneous result" in temporarily restricting Texas's ability to enforce GA-09 insofar as it bans all procedural and medication abortions. *See In re Lloyd's Register N. Am., Inc.*, 780 F.3d at 290.  Mandamus relief should be denied.

* * *

The district court's result was supported by nearly 50 years of Supreme Court precedent protecting a woman's right to choose, and as such I would not conclude that it was patently erroneous.  In a time where panic and fear already consume our daily lives, the majority's opinion inflicts further panic and fear on women in Texas by depriving them, without justification, of their

constitutional rights, exposing them to the risks of continuing an unwanted pregnancy, as well as the risks of travelling to other states in search of time-sensitive medical care.

I respectfully but emphatically dissent.